JOSEPH W. MORRISON *et al. vs.* ALBERT J. LAMARRE *et al.*
LAWRENCE A. MCCARTHY *et al. vs.* SAME.
NATHAN FLEISHER *vs.* ARMAND H. COTE, *Secretary of State.*
SAME *vs.* ALBERT J. LAMARRE *et al.*

MARCH 29, 1949.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

O'CONNELL, J.   These are four petitions for certiorari, the first, second and fourth seeking to quash rulings of the state board of elections which denied the petitioners, in the election of November 2, 1948, the right to the use of certain devices on the voting machines, commonly referred to as master levers, whereby a voter by means of a single operation may vote for all candidates of a political organi-

zation. The third petition seeks to quash the ruling of the secretary of state denying to the petitioner the use of a party emblem in said election.

The rulings complained of were based upon general laws 1938, chapter 318, §§2, 6, 9, as amended by chap. 2151 of the public laws passed at the January session 1948 and approved May 6, 1948.

The pertinent language of G. L. 1938, chap. 318, as thus amended, reads as follows:

"§2. * * * The term 'party' or 'political party' shall mean any political organization which at the preceding general election polled at least 5 per centum of the entire vote cast in the state for governor."

"§6. * * * In the preparation of all ballot labels, sample ballots, absentee ballots and war ballots, to be used at any state or town election (which terms shall not include any primary) the secretary of state shall cause to be printed at the top of each column containing the names of candidates of a political party, as defined in section 2 hereof, over the name of the political party whose candidates appear in such column, the emblem of such political party. The emblem of the democratic party shall be the representation of a star. The emblem of the republican party shall be the representation of an eagle. The emblem of any political organization qualifying as a political party, as defined in section 2 of this chapter, shall be selected by the state chairman of said party; *provided, however,* that the emblem shall be entirely different for each political party, and may be any appropriate symbol; but neither the coat of arms or seal of any state or of the United States, the national or state flag, any religious emblem or symbol, the seal of any society, the portrait or likeness of any person, or the representation of a coin or of the currency of the United States, shall be chosen as an emblem. Whenever any emblem shall have been selected and used upon official ballots and ballot labels for any political party, it shall not thereafter be used for any other political party."

"§9. * * * In the preparation of the voting machines

for use in. every state or town election, (which terms shall not include any primary) the board of elections shall cause the party devices, commonly referred to as party levers, over each of the columns containing candidates of political parties, as defined in section 2 of this chapter, to be adjusted so as to permit any voter to vote for all candidates of the respective party whose names appear in said column by means of a single operation. All such devices over columns which do not contain candidates of political parties, as defined in section 2 of this chapter, shall be locked in such manner as to prevent voting by use of such party devices."

All the petitions are based on the contention that chap. 318, as amended, is unconstitutional in that it is repugnant to article XIV, section 1, of amendments to the constitution of the United States, and to article I, sec. 2, and article II, sec. 6, of the constitution of the state of Rhode Island, in that said act is discriminatory and not of equal force and effect as to all candidates seeking elective office. Petitioners also contend that the definition of a "political party" under chap. 2151 should not be construed to apply in the election of November 2, 1948, because a contrary construction would make the statute retrospective or retroactive.

These petitions were heard on briefs and oral arguments on October 22, 1948 and the court was advised by the respondents that they would have to start sending the voting machines to the respective polling places at twelve o'clock noon on the following day to insure a full, free and fair election on November 2, 1948 in accordance with the provisions of law. Because of such necessity the court, after as full consideration of the issues involved as was possible within such a short time, gave a memorandum decision on October 23, 1948, denying and dismissing each petition and refusing to quash the rulings complained of. However, at that time it was indicated that since the issues raised were of importance, a formal opinion would be filed later giving in more detail the reasoning and authorities upon which the decision was based.

Before passing upon the constitutional questions involved, we shall dispose of the contention that chap. 2151, so far as the definition of a political party and the use of party emblems are concerned, must be held to be retroactive or retrospective, and should not apply until the next general election in 1950.

It appears to be well settled that unless a contrary intention plainly appears, a statute operates prospectively only and is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment. *Reynolds* v. *United States,* 292 U. S. 443. In *State ex rel.* v. *Brown Service Funeral Co.,* 236 Ala. 249, it was held that an insurance law was not retroactive merely because it looked to the past for the purpose of information on which a computation was to be made to ascertain an amount to be effective for future operation; and in *Chicago, Burlington & Quincy R. R.* v. *State of Nebraska ex rel.,* 47 Neb. 549, the court said: "A statute does not operate retroactively from the mere fact that it relates to antecedent events."

It is conceded that if the law is to be considered as operating prospectively, none of the petitioners qualify as a political party under the definition thereof in chap. 2151. They are therefore not entitled *as a matter of right* to the use of party levers or party emblems, unless the act should be held unconstitutional.

Before the passage of chap. 2151 the statute defined the terms "party" or "political party" as any political organization or group of citizens which at the next preceding election of state officers had polled at least 2 per cent of the entire vote cast in the state for governor. One group of petitioners contended that they had polled at least 2 per cent but less than 5 per cent of the entire vote cast in the state for governor at the last preceding election and therefore had such a vested right as a political party that the legislature could not increase the percentage to 5 per

cent until after another general election had intervened. All the petitioners were local organizations, had no state-wide status, and had presented no candidates for state-wide elective office at the preceding election.

Without deciding whether the legislature intended to apply this 2 per cent or 5 per cent yardstick only to a political party which had a state-wide organization and had cast votes for governor or other state officers at the last preceding general election, and assuming merely for the purpose of argument that any such petitioner would be qualified as a political party on the 2 per cent basis, we see no merit in the contention that the legislature could not increase the percentage figure to become operative before another general election.

In *State ex rel.* v. *Jensen,* 86 Minn. 19, it appears that the statute had given certain privileges to political parties polling at least one per cent of the entire vote cast for general officers. The Prohibition party had cast more than one per cent and less than ten per cent of the entire vote cast at the last election. The legislature then changed the act and defined a political party as "one which shall have cast at least ten (10) per cent. of the total vote cast at the last preceding election for its leading candidate * * *."

The court held that the relator, a candidate of the Prohibition party, was not entitled to have his name placed upon the official ballot at the next election as such Prohibition party was not qualified as a political party under the amended act. The court said: "While it seems to some of us that the percentage of the vote selected as the basis of the classification in this act is larger than necessary, yet it was a question for the legislature, and we are not justified in holding that the classification was arbitrary. We hold the law as we have construed it constitutional."

In *State ex rel.* v. *Blaisdell,* 20 N. D. 622, the court decided that the legislature may, within reasonable limits, determine how many voters, acting together for the purpose of making nominations, shall be entitled to a party ballot.

In *DeWalt* v. *Bartley,* 146 Pa. 529, a law requiring a party, in order to have representation as such on the official ballot, to have polled 3 per cent of the total vote cast at the last general election was sustained. It was held that some such regulation was absolutely necessary as an accompaniment to the law requiring use of the Australian form of ballot, and that the right to nominate is primarily a party right and necessarily requires, in order to have substantial significance, that there should also be a party of significance. Otherwise, as stated, a few persons could assume to be a party—as the "three tailors of Tooley street" assumed to be the "people of England"—and successfully demand use of a party ballot thereby resulting in the scheme of an official ballot being impracticable as the ballot would "become the size of a blanket." Similar statutes have been upheld in other states. *Miner* v. *Olin,* 159 Mass. 487; *State ex rel.* v. *Poston,* 58 Ohio St. 620.

In the instant cases the last section of chap. 2151 reads as follows: "Sec. 4. This act shall take effect upon July 1, 1948 and thereupon all acts and parts of acts inconsistent herewith shall stand repealed." By express language, therefore, the date of its effective operation is made at a future time after the date of its passage. The act looks to the future in making its requirements for its prospective operation and to the past only for information on which a computation can be based to ascertain who may be termed a political party under the provisions of the act. However, a law is not retroactive merely because it looks to the past for such purpose. On the authority of the above cases and by reason of the precise language of chap. 2151, we are of the opinion that this chapter should be construed as prospective and not retroactive and is applicable by its terms to the election of November 2, 1948.

Before deciding the constitutional questions involved herein, we shall discuss some of the general principles of law which a court should have in mind in deciding the constitutionality of a legislative enactment. The presump-

tion of the validity of a statute and the rule that a law should not be declared unconstitutional unless the court is satisfied of its invalidity beyond a reasonable doubt are clearly enunciated in many Rhode Island cases and in numerous decisions from other jurisdictions.

In *Manufacturers Mutual Fire Ins. Co.* v. *Clarke*, 41 R. I. 277, the court used the following language: "An act of the General Assembly must stand unless its repugnancy to the constitution appears upon its face or upon a consideration of facts of which the court can take judicial notice. It has generally been held by the federal and state courts that extrinsic evidence will not be received for the purpose of impeaching the constitutional validity of a legislative act."

In *LaPlante* v. *State Board of Public Roads,* 47 R. I. 258, the court said: "Whether the statute is reasonable or unreasonable is a question of legislative policy with which the court has no concern. *If a statute is repugnant to no constitutional provision* it is the duty of the court to uphold the validity of the act without regard to the question of reasonableness. * * * and it is always presumed that an act of the legislature is constitutional until the contrary clearly appears." (italics ours)

Referring to the rules which a court should apply in performing its supreme function of deciding whether a legislative act of the same government is invalid, this court stated in *Gorham* v. *Robinson,* 57 R. I. 1, at page 7: "The first of these rules is that the courts 'approach constitutional questions with great deliberation, exercising their power in this respect with the greatest possible caution and even reluctance; and they should never declare a statute void, unless its invalidity is, in their judgment, beyond reasonable doubt.'" To the same effect see *Fritz* v. *Presbrey,* 44 R. I. 207; *Amitrano* v. *Barbaro,* 61 R. I. 424.

This rule has been clearly enunciated in a host of other and earlier cases, including the following: *In the Matter of Dorrance Street,* 4 R. I. 230; *State* v. *District of Narra-*

*gansett,* 16 R. I. 424; *State* v. *Kofines,* 33 R. I. 211, 219; *East Shore Land Co.* v. *Peckham,* 33 R. I. 541; *Sayles* v. *Foley,* 38 R. I. 484. The same rule obtains in other jurisdictions. *Munn* v. *Illinois,* 94 U. S. 113; *Wellington et al. Petitioner,* 16 Pick. 87, 95. 6 R. C. L. 76, §73.

The issue raised in the cases at bar is one which has aroused considerable public interest. Petitioners contend in effect that the law is harsh and unwise and the court can and should for that reason set the alleged obnoxious statute aside and declare it unconstitutional. Such a view is not only fallacious, but its adoption would be fraught with great danger to our democratic form of government. That form of government is by our state constitution expressly distributed into three departments, legislative, executive and judicial, each of which is vested with certain powers set forth in express language of the constitution. In the exercise of these powers each branch of the government is supreme in its respective field, which neither of the other two branches may invade.

The judicial department has no legislative power. It cannot enact laws but can only construe them and, when the question has been properly presented, determine their constitutionality. In other words, it may determine only whether the legislative branch exceeded the power given it under the language of the constitution, expressed or necessarily implied. No legislative act can be set aside by judicial fiat merely on the ground that its policy may be considered harsh or unwise. There must be a constitutional basis for setting aside a legislative act because courts are as much bound by law as are other departments of government or individuals. The legislature is unquestionably vested by the constitution with the power to determine whether a statute is wise or necessary or desirable in the public interest.

Such arguments, however appealing they may be from the standpoint of expediency or responsiveness to public sentiment or clamor, are nevertheless properly addressed to the

legislative branch of government in an effort to obtain an amendment or repeal of such a statute. The only test which this court may properly apply is whether the legislature had the power under the constitution to enact the legislation in question.

The law upon this question is clear and unequivocal. The supreme court of the United States in *Chicago, Burlington & Quincy R. R.* v. *McGuire,* 219 U. S. 549, said: "The scope of judicial inquiry in deciding the question of *power* is not to be confused with the scope of legislative considerations in dealing with the matter of *policy.* Whether the enactment is wise or unwise * * * whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance. * * * 'The mere fact * * * that judges may hold views inconsistent with the propriety of the legislation in question, affords no ground for judicial interference, unless the act in question is unmistakably and palpably in excess of legislative power.' "

In *People* v. *Lochner,* 177 N. Y. 145, 156, the rule was expressed as follows: "The courts are frequently confronted with the temptation to substitute their judgment for that of the legislature. A given statute, though plainly within the legislative power, seems so repugnant to a sound public policy as to strongly tempt the court to set aside the statute, instead of waiting, as the spirit of our institutions require, until the people can compel their representatives to repeal the obnoxious statute."

In *Gorham* v. *Robinson, supra,* this court said, at page 10: "The statute complained of in the instant cases may give rise to such temptation. It may not appeal to some as wise or prudent legislation, but on that basis we have no warrant to declare it void. As was well said by Stiness, C. J., in *Floyd* v. *Quinn,* 24 R. I. 147, 152: 'The legislature and judiciary are co-ordinate branches of the government, but

both are created by the people in the constitution. The presumption is that the people trust the legislature equally with the courts, and all the more so because the legislature is more directly amenable to the people.' The question before us, as in that case, is not one of the policy of the law but of its constitutionality, and as Stiness, C. J., further said, 'an unwise use of power does not render the exercise of it unconstitutional.' If the power to enact legislation is in the legislature, the wisdom or prudence of it is beyond our province. If it is not wise or prudent, then the people and not this court have the power to apply the necessary corrective."

Guided by the rules of law above set forth, we shall consider (1) whether chap. 2151 of P. L. 1948 is violative of the constitution of the United States; and (2) whether it is violative of the constitution of Rhode Island.

The petitioners contend that such statute is repugnant to article XIV, section 1, of amendments to the constitution of the United States. In our opinion this contention is not tenable. The rights of person and property are guaranteed by three distinct provisions of the fourteenth amendment of the federal constitution which declares: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The protection which is extended to citizens of the United States by the privileges and immunities clause includes those rights and privileges which, under the constitution and laws of the United States, are incident to citizenship of the United States, but it does not include rights pertaining to state citizenship, which are derived solely from the relationship of the citizen and his state and are established by state law. *Slaughter-House Cases,* 16 Wall. 36, 74, 79; *Maxwell* v. *Bugbee,* 250 U. S. 525, 528; *Prudential Ins. Co.*

*of America* v. *Cheek,* 259 U. S. 530, 539; *Madden* v. *Kentucky,* 309 U. S. 83, 90; *Snowden* v. *Hughes,* 321 U. S. 1, 6.

It has also been held that the right to become a candidate for state office, like the right to vote for the election of state officers, is a right or privilege of state citizenship and not of national citizenship, which alone is protected by the privileges and immunities clause of the federal constitution. *Minor* v. *Happersett,* 21 Wall. 162, 171; *Pope* v. *Williams,* 193 U. S. 621, 632; *Breedlove* v. *Suttles,* 302 U. S. 277, 283; *Snowden* v. *Hughes, supra.* In fact, it has been further held that even an unlawful denial by state action of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause of the federal constitution. *Taylor* v. *Beckham* (No. 1), 178 U. S. 548; *Snowden* v. *Hughes, supra.*

In the instant cases no federal offices were involved and we are of the opinion that there is no merit in the petitioners' contention that chap. 2151 violates article XIV, section 1, of the constitution of the United States.

We shall next consider the constitutionality of chap. 318, as amended, so far as it affects certain provisions of the constitution of Rhode Island, which read as follows. Article I, sec. 2: "All free governments are instituted for the protection, safety and happiness of the people. All laws, therefore, should be made for the good of the whole; and the burdens of the state ought to be fairly distributed among its citizens." Article II, sec. 6: "The general assembly shall have full power to provide for a registry of voters, to prescribe the manner of conducting the elections, the form of certificates, the nature of the evidence to be required in case of a dispute as to the right of any person to vote, and generally to enact all laws necessary to carry this article into effect, and to prevent abuse, corruption and fraud in voting."

Courts have uniformly held that the right to vote is neither a property right nor a right of person, but a political privilege which the legislature may regulate to any extent

not prohibited by state or federal constitutions. Where an act of the legislature subverts or destroys the right to vote, it may well be claimed to be unconstitutional, but where it merely attempts to classify and regulate, as in the instant cases, such act is clearly constitutional.

In *Todd* v. *Boards of Election Comm'rs,* 104 Mich. 474, it was claimed as one ground for the unconstitutionality of an act that certain voters would have to mark their ballots more than once if they wished to vote a full ticket, while others would be required to make only one mark. At page 481 the court said: "The Constitution does not guarantee that each voter shall have the same facilities with every other voter in expressing his will at the ballot-box * * *. The constitutionality of the law is not to be tested by the fact that one voter can cast his ballot by making one mark, while another may be required to make two or more to express his will. When each has been afforded the opportunity and been provided with reasonable facilities to vote, the Constitution has been complied with. All else is regulation, and lies in the sound discretion of the Legislature, to whom alone such regulation is committed. Courts cannot hold such provisions unconstitutional because, in their judgment, they are harsh or unwise, or have their origin in partisan purposes. Constitutional laws often have their origin in such purposes, and unconstitutional laws are often based upon pure motives and honest intentions. Courts have nothing to do with the motives of legislators, nor the reasons they may have for passing the law."

In *Oughton* v. *Black,* 212 Pa. 1, which was a bill in equity to restrain the printing of ballots in such form that straight ticket voters could vote by a single mark, the court said: "What is the real complaint of the appellants? * * * It is simply that certain electors in going into the election booths, possessing no higher, but just the same right to freely cast their votes and have them counted that every other elector in the commonwealth possesses, may mark

their tickets more readily and quickly than the elector who, in wishing to assert his absolute right of independence of any political party, makes up his own ticket, and, in doing so, necessarily is required to consume more time. In other words, because those voters who insist upon making up their own tickets, as is their unquestioned right, must necessarily make a number of marks, the contention of the appellants is that elections are not equal if other electors may indicate the candidates of their choice by making fewer marks. Because some in giving expression to a freeman's will must make a number of marks, the position of the appellants, as logically understood, is that elections are not equal unless the rest of the electors, satisfied with party nominations and willing to vote for political candidates named, are required to spend as much time in marking their ballots. This is not the test of inequality. Each individual voter as he enters the booth is given an opportunity to freely express his will with no one by him to influence or intimidate him, and from the face of the ballot he is instructed how to mark it. If unable to understand the instructions, a qualified elector of the district, selected by himself, may enter the voting apartment and assist him. This is the right given to every elector, and, therefore, is an equal one."

The principles enunciated in the above cases are equally applicable to the situation presented to us in the instant cases. Here the voter is not denied a fair opportunity to cast his ballot for any candidate he chooses. The mere fact that for a given set of candidates he is required to operate only one lever if he wishes to vote for all of them does not result in any inequality because another voter who desires to vote for various candidates of different parties is required to operate more than one lever. As was said by the Illinois supreme court in *People ex rel. v. Hoffman,* 116 Ill. 587, "Elections are equal, when the vote of every elector is equal, in its influence upon the result, to the

vote of every other elector,—when each ballot is as effective as every other ballot."

It may well be that our legislature in enacting chap. 2151 may have envisioned a future election when possibly there might be more groups of candidates than there were master levers available on the voting machines. It may have considered and rejected the proposal to meet such a contingency by reverting to the use of large paper ballots because for ample reasons it already had abandoned that media in favor of voting machines. It may likewise have decided against authorizing a great expenditure to purchase hundreds of larger voting machines which conceivably might be needed only on rare occasions, and when even such larger machines might again be insufficient for some very extraordinary future election. Such reasons may have appealed with great force to the legislature, especially when it knew that the existing machines had proved adequate in the past to satisfy all the usual election requirements and essential provisions of law where reasonable regulations had been adopted.

Likewise it may have decided that to meet such problem by depriving *all* parties or groups of a master lever, while seeming to solve one particular difficulty, could well create other and graver problems and effects. The overwhelming majority of votes cast in elections in this state historically has been divided between two major political groups whose status as political parties under the law has already been established. If each of almost 300,000 such electors were obliged by several operations to spend a much longer time in voting than would be required to vote for the same candidates by using one operation, *viz.*, the master lever, it is not unreasonable to suppose that the legislature foresaw that in many large precincts voters would be required to wait long periods for an opportunity to vote, and that such a delay would tend to discourage many from voting at all. Indeed, it might well have considered that, because of the extra time required to handle a large vote under

such conditions, many electors who had been waiting to vote conceivably would be shut out at the closing of the polls and thus be deprived through no fault of their own of an opportunity to cast their votes.

The legislature, therefore, may well have concluded that such results were most undesirable and harmful, and that they could be obviated, without unnecessary expenditure and within the powers expressly granted to them under our constitution, by enacting the pertinent provisions of chap. 2151. Such statute would then amount to an indirect regulation upon the manner of holding elections in order to promote the orderly conduct thereof and at the same time secure to all qualified electors a better opportunity to cast their votes and have them counted. In other words, by granting the privilege of a master lever only to groups who qualified as a political party in accordance with the specified condition, the overwhelming proportion of the total number of votes cast would be accelerated legitimately, thereby assuring to the independent and other voters more time and opportunity in which to cast their votes.

It is now well settled in this jurisdiction that if a state of facts could exist which would justify legislation, then this court should presume that such facts did exist. *Fritz* v. *Presbrey, supra; Opinion to the Governor*, 75 R. I. 54.

From the above authorities it seems clear that the legislature may require, as a condition precedent to appearing on the official ballot as a political party, that such a group of candidates shall have secured at the preceding general election a reasonable percentage of the total vote cast for governor. If the legislature could thus deny a place on the ballot to a political group or party unless specified conditions are met, it would seem to follow *a fortiori* that it may restrict the use of master levers and emblems to a political party which had polled the prescribed percentage of the vote cast for governor at the preceding general elec-

tion, so long as reasonable facilities to vote for other groups of candidates on the ballot were not denied.

We are of the opinion that the statute here attacked treats equally and without discrimination all political parties which had polled at least 5 per cent of the vote cast for governor at the preceding general election, and accords uniform treatment to all those political groups which had polled less than 5 per cent of such vote. Moreover it does not deny the right of any political group appearing on the ballot to have votes cast and counted for some or all of their candidates as the voter may choose. For these reasons it comes within the range of permissible classification and regulation in the matter of elections and the manner of holding them which is inherent in the legislature under the powers expressly granted by article II, sec. 6, of the constitution of this state.

In our opinion such a provision is in the nature of a reasonable regulation and not an abridgment of the franchise of the voter or of the rights of any political group or party, since the right of every elector to cast his vote for every candidate of such a political party, or otherwise if he chooses, is fully preserved and protected. In our opinion mere minor inconvenience in the method of casting a vote does not afford sufficient reason to declare that a legislative act is unconstitutional beyond a reasonable doubt.

We note here that the instant cases are clearly distinguishable from and are not governed by the cases of *Cahir* v. *Cote,* 72 R. I. 188; *Cahir* v. *Lamarre,* 72 R. I. 193; *Moses* v. *Cote,* 72 R. I. 196. There we were concerned with a construction of the then existing statutes and not with the legislature's constitutional power to enact them. We held that in the absence of statutory provision the secretary of state was not authorized to arbitrarily discriminate between political groups which had qualified under the law as political parties. We found no statutory authority to support his action and that mere practice did not supply the authority which was not given by legislative enactment.

In the instant cases there is no question of construction and the act was passed after the above-cited cases were decided. Thereby the legislature has changed the law and now has specifically provided conditions precedent to acquiring the status and privileges of a political party on the ballot. Here we are concerned solely with the power of the legislature under our constitution to make such provision as to a political party; and the petitioners in argument before this court conceded that if chap. 2151 is within the constitutional power of the legislature, the instant cases are entirely different from and are not governed by the *Cahir* and *Moses* cases, *supra.* Here the legislature has supplied express authority to treat political parties in a specified manner.

It should also be noted that each group of petitioners has appeared here to assert alleged rights as a political party. We have considered the arguments, however, not only from the standpoint of the rights of a political group as such, to which strictly speaking such a group might well be confined, but also from the viewpoint of the rights of the individual voter. In our opinion the inconvenience resulting from the denial of the master lever privilege cannot reasonably be said to disenfranchise any voter or tend to destroy his right to vote for as many different candidates of his choice as the law permits; nor does such inconvenience destroy any right to which a political group as such might be entitled under the law.

We are of the opinion that G. L. 1938, chap. 318, as amended by P. L. 1948, chap. 2151, is in the nature of a regulation of the manner of holding and conducting an election; that it does not in any way destroy the elective franchise of any individual voter or defeat the right of any political group or party to have votes cast and counted for all its candidates; that it merely makes a permissible classification to promote the orderly and expeditious handling of an election, which is within the express powers granted to the legislature under article II, sec. 6, of the

constitution of this state; and that therefore G. L. 1938, chap. 318, as amended by P. L. 1948, chap. 2151, cannot be said to be unconstitutional beyond a reasonable doubt.

The petition for certiorari in each case is denied and dismissed.

CAPOTOSTO, J., dissenting. I am unable to agree that sec. 3, chap. 2151, P. L. 1948, is constitutional. That section restricts the use in an election of the party lever on voting machines to members of certain political parties only.

The following well-known rules of construction, so fully stated and supported by authority in the foregoing opinion, are admitted. The wisdom of a particular statute is not a question for the court so long as it is within the constitutional power of the legislature, and no motive or purpose, other than appears upon the face of the statute, can or should be imputed to the legislature. Also, the courts approach constitutional questions with great caution and they will not declare a statute unconstitutional unless, in their judgment, its invalidity on such ground is established beyond reasonable doubt. But, notwithstanding these general rules of construction, the constitution is above a statute and if the two are in conflict it is the duty of the court to declare the statute unconstitutional, however reluctant it may be to so declare.

It is stated in the main opinion that these cases have aroused considerable public interest because, as the court there interprets petitioners' contention, the law is harsh and unwise. I agree that the cases have aroused public interest but I disagree with the ground that is assigned therefor. In my judgment the public is vitally interested in the question at issue because the provision under examination is a discriminatory invasion of the elective franchise, and not because such provision is merely harsh and unwise.

These cases do not concern a claim of right to a party lever by a single candidate, nor are they concerned with

the difficulty that a voter, unaffiliated with any party, may encounter in selecting candidates of his choice and thus make up a personal ticket of his own. The question at issue here is whether the legislature has the power to grant the use of a party lever on voting machines to members of a political party as defined in the statute, hereinafter called a recognized party, so that such members can vote a straight party ticket by merely operating that lever, and to deny the same or substantially equal facility to the members of an independent political party, organization, or group of electors, hereinafter called a minority party, which does not come within such definition but whose ticket is entitled as of right to be upon the official ballot. Since no candidate for federal office was here involved, I agree that article XIV, section 1, of the amendments to the United States constitution does not apply in the instant cases. The question at issue here is controlled solely by article II, sec. 6, of the constitution of this state.

Section 1, chap. 2151, P. L. 1948, is as follows: "The term 'party' or 'political party' shall mean any political organization which at the preceding general election polled at least 5 per centum of the entire vote cast in the state for governor." Section 3 of that chapter, which raises the question in these cases, provides that in the preparation of the voting machines for use in every election or primary the board of elections shall cause the devices, commonly referred to as party levers, over each of the columns containing candidates of political parties, as defined in section 1, "to be adjusted so as *to permit* any voter to vote for all candidates of the respective party whose names appear in said column by means of a single operation." (italics ours) It then proceeds to provide that all such devices over columns which do not contain candidates of political parties as defined in section 1 "shall be *locked* in such manner as *to prevent* voting by use of such party devices." (italics ours)

The language of the two sections just mentioned is clear. The legislative intent and purpose as therein expressed is

to confer a special privilege in the manner of voting to voters desiring to vote the straight ticket of a recognized party and to deny the same or similar privilege to voters of a minority party who intend to vote the straight ticket of that party. The petitioners contend that legislation leading to such a situation is pure discrimination, in that its direct and inescapable result is to interfere with free elections by unnecessarily abridging or impeding the constitutional right of a voter to cast his vote on a substantially equal basis with every other voter.

Article II, sec. 6, of our constitution, entitled "Of the Qualifications of Electors," provides that "The general assembly shall have full power to * * * prescribe the manner of conducting the elections * * * and generally to enact all laws necessary to carry this article into effect, and to prevent abuse, corruption and fraud in voting." In my opinion the ultimate object of this provision, like all constitutional provisions of a similar nature in this country, is to guarantee to our citizens a democratic form of government, as we understand it, through an equal opportunity and with the same facilities, in so far as reasonably possible, to cast their respective votes for a party ticket lawfully before them for election. It is inconceivable to me that the framers of our constitution intended to give the legislature power to extend special facilities in voting for a straight ticket to members of one party and to deny the same or equal facilities to the members of a minority party which did not meet the changeable legislative definition of a political party. Whether a party is a recognized or minority party, the constitution demands equality of treatment in the facilities that are afforded to members of both parties in the matter of straight party voting. To hold otherwise tends insidiously to subvert our time-honored belief in free elections with equal opportunity for equally qualified electors to express their will without discrimination under substantially the same conditions.

This fundamental principle of our political life permeates innumerable decisions of our courts and the writings of eminent authors on constitutional matters. In 2 Cooley's Const. Limit. (8th ed.) 1370, we read as follows: "All regulations of the elective franchise, however, must be reasonable, uniform, and impartial; they must not have for their purpose directly or indirectly to deny or abridge the constitutional right of citizens to vote, or unnecessarily to impede its exercise; if they do, they must be declared void." In *Matter of Callaghan v. Voorhis,* 252 N. Y. 14, where a question involving voting machines was at issue, the court at page 17 said: "The whole purpose of the Election Law and of the Constitution under which it is enacted, is that, within reasonable bounds and regulations, all voters shall, so far as the law provides, have equal, easy and unrestricted opportunities to declare their choice for each office. Section 249 of the Election Law is constitutional except in those instances when to apply it would be unfair and prejudicial to a particular class of voters."

In *Matter of Crane v. Voorhis,* 257 N. Y. 298, the court, again speaking with reference to the use of voting machines, at pages 303 and 304, said: "The Election Law is aimed to afford facility for ready voting as well as to guard against illegal and dishonest practices. All voters within reasonable regulation must have the same opportunity or else they are disenfranchised within the spirit and meaning of the Constitution. Provided all have an *equal start and fair opportunity* to make their independent choice, irrespective of what that choice may be, we must abide under our form of government by the result of the election. The choice, however, of our representatives who rule us must at least, so far as the law itself can make it, be free, open and *unrestricted* to all. Regulations and restrictions there must be, but these must apply to all alike and not create conditions which make it easy for one but difficult and confusing for another." (italics ours)

As a matter of fact there is no need to go outside our own state for authority on the point under discussion as in the recent past we have expressed ourselves substantially to the same effect, though not so fully as the New York court did in the above-cited cases. In *Cahir* v. *Cote,* 72 R. I. 188, this court granted the petitioner the right to have the ticket of a minority party aligned in one column on the voting machine for voting that ticket by use of the party lever. Although the decision in that case preceded the enactment of chap. 2151 now under consideration, yet what we there said concerning the intent and purpose of the election laws is just as sound today as it was then. At page 192 of that opinion this court said: "The spirit of the election laws requires that a political party that complies with the law in making its nominations of candidates is entitled to receive from the secretary of state, so far as reasonably practicable, the same general treatment that is given by him to other political parties in the matter of making up the diagram and ballot labels for use in the voting machines." This same principle of equality between recognized and minority parties was expressly reaffirmed in *Cahir* v. *Lamarre,* 72 R. I. 193, 195; *Moses* v. *Cote,* 72 R. I. 196; *Fleischer* v. *Cote,* 74 R. I. 68.

One of the arguments advanced in the main opinion to support the constitutionality of sec. 3, chap. 2151, is that the legislature may require as a condition precedent "to appearing on the official ballot as a political party" that a group of candidates shall have secured at the preceding election a reasonable percentage of the total vote cast for governor. From such premise it is concluded that *a fortiori* the legislature may restrict the use of master levers and emblems to a political party which had polled the prescribed percentage of the vote cast for governor, "so long as reasonable facilities to vote for other groups of candidates on the ballot were not denied." In plain language such an argument begs the very question in issue in these cases. A voter belonging to a group of electors or a political

organization which does not qualify as above stated is not to be subjected to discrimination in the facilities offered him for casting his vote. Within the limits of reasonable possibility, every voter is entitled to the same or equal facilities in the *actual casting of his vote*. To restrict one group of voters merely to "reasonable facilities to vote," whatever such phrase may mean, and to grant greater facilities in that respect to another group on the sole ground of the numerical strength of their respective parties is an invasion of the elective franchise.

Our constitution undoubtedly gives the legislature power to prescribe the manner of "conducting" the elections, but to say that under such provision it has by implication the power to impede a voter in the actual exercise of the franchise through the medium of a legislative definition of what shall constitute a "political party" is beyond a fair interpretation of that language. The legislature may designate, among other things and within the bounds of reasonable discretion, what position a recognized party shall have on the official ballot, the place and hours for voting, who shall act as officials at the polls, how and to whom the returns shall be made, and other matters of a similar nature, all of which are in furtherance of holding orderly elections and thus "prevent abuse, corruption and fraud in voting," as the constitution prescribes. Section 3, chap. 2151, goes far beyond the scope of legitimate and reasonable regulation in the manner of *conducting* elections and instead of preventing *abuse in voting* it strongly tends otherwise.

Furthermore the proposition under discussion is in our opinion inconsistent with the whole course of our political life. In this country the right of voters holding common political beliefs to advocate their views through party groups or organizations for peaceful determination by the electorate in an election has never been questioned to my knowledge. A two-party system may be envisioned by those so minded, but it does not follow that such result may be accomplished by legislative fiat through discrimina-

tion between equally qualified voters in the exercise of the franchise. The electorate itself must ultimately determine that question. In the meantime a minority party should not in effect be legislated out of existence by a law that discriminates in favor of a recognized party.

Another reason advanced in the main opinion to support the constitutionality of sec. 3 is that the legislature may have enacted that section in contemplation of some imaginary future situation wherein voting machines might prove inadequate to furnish a party lever to all political parties entitled to appear upon the official ballot. In the absence of circumstances fairly open to such an assmuption, considerations of that character amount to nothing more than pure speculation. The statute itself makes no mention of the existence of any such condition, nor was any claim of that nature advanced in the argument to us in these cases. In fact it was then conceded that the voting machines had more party levers than were required for use by recognized parties and all these petitioners.

Assuming, however, that the voting machines were inadequate as suggested, the situation thus raised should not be solved by imposing restrictions upon one class of voters to the advantage of another such class. There are means, unnecessary to mention now, by which every voter may be given the same or similar facilities in casting a straight vote for a party ticket. Mere inconvenience in providing substantially equal facilities for voters of all parties to vote a straight party ticket furnishes no ground for discrimination between voters of the various parties respecting the facilities accorded them for party voting.

Before concluding this dissent it is well to note here that the cases of *Todd* v. *Boards of Election Comm'rs,* 104 Mich. 474, *Oughton* v. *Black,* 212 Pa. 1, and *People ex rel.* v. *Hoffman,* 116 Ill. 587, upon which the main opinion strongly relies and quotes extensively therefrom, are clearly distinguishable in their facts from the instant cases and are therefore of doubtful value in determining the issue at bar. It

is unnecessary to mention the precise question before the court in the above-cited cases as it is sufficient to point out that a close reading of those cases will disclose that in each of them the voters of *all* parties had an equal opportunity to vote a straight party ticket under the same conditions.

Special attention is here directed to *Matter of Hopper* v. *Britt*, 203 N. Y. 144, where, at page 152, the court said: "While the Constitution does not guarantee that the elector shall be allowed to express his vote by a single mark, our position is that he is guaranteed the right to express his will by a single mark if other voters are given the right to express theirs by a single mark and there is no difficulty in according the right to all." In that case the court refused to follow the reasoning in *Todd* v. *Boards of Election Comm'rs, supra,* and at page 155 further intimated that the Michigan court itself had apparently modified its views as expressed in the *Todd* case when it used the following language in the later case of *Dapper* v. *Smith*, 138 Mich. 104: " 'The authority of the legislature to enact laws for the purpose of securing purity in elections does not include the right to impose any conditions which will destroy or seriously impede the enjoyment of the elective franchise.' "

In my opinion sec. 3 of chap. 2151, which grants a party lever to voters of a recognized party and denies it to the voters of a minority party properly on the ballot, is not, as stated in the main opinion, "an indirect regulation upon the manner of holding elections," but rather plain discrimination between equally qualified voters in the actual exercise of their elective franchise. Such legislation instead of preventing abuse in voting, as the constitution commands, clearly violates that mandate. I am therefore constrained to hold that sec. 3, chap. 2151, P. L. 1948, is unconstitutional in that it is inconsistent with and violative of article II, sec. 6, of the constitution of this state.

BAKER, J. concurs in the dissenting opinion of Mr. Justice Capotosto.

*Edward Geremia* for Joseph W. Morrison *et al.,* petitioners.

*McCarthy & Flynn, Lawrence A. McCarthy* for Lawrence A. McCarthy *et al.,* petitioners.

*Nathan Fleischer,* for Nathan Fleischer, petitioner.

*John H. Nolan,* Attorney General, *Archie Smith,* Ass't Atty. Gen., for respondents.