**METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY, Metropolitan Casualty Insurance, Metropolitan General Insurance Company**

v.

**RHODE ISLAND INSURER'S INSOLVENCY FUND, and Fred Franklin, acting in his official capacity as Director of R.I. Department of Business Regulations, Division of Insurance.**

No. Civ. A. 90–0545–T.

United States District Court,
D. Rhode Island.

Feb. 2, 1993.

Richard Berstein, Warwick, RI, James Lenaghan, New York City, Stephen Ostrach, Boston, MA, for Metropolitan Property and Cas. Ins. Co., et al.

William R. Grimm, Hinckley, Allen Snyder & Comen, Providence, RI, for Rhode Island Insurers' Insolvency Fund.

Ellen Evans Alexander, Office of the Attorney General, Providence, RI, for Fred J. Franklin.

## MEMORANDUM AND OPINION

TORRES, District Judge.

### INTRODUCTION

This is a § 1983 action by three affiliated insurance companies [1] (collectively referred to as "Metropolitan") challenging the constitutionality of a Rhode Island statute that permits the Rhode Island Insurers' Insolvency Fund (the "Fund") to make assessments against insurers that underwrite one line of coverage in order to pay claims against insolvent insurers underwriting different lines of coverage. Metropolitan contends that such assessments amount to a taking of its property without due process or just compensation and that they constitute a denial of its right to equal protection

---

1. Metropolitan Property and Casualty Insurance Company, Metropolitan Casualty Insurance Company, and Metropolitan General Insurance Company.

in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

Metropolitan seeks a declaratory judgment declaring the statute unconstitutional and an injunction barring such assessments. In addition, it seeks to recover the assessments it has been required to pay together with interest, attorneys' fees and the costs it has incurred in bringing this suit.

The case is presently before the Court for a decision on the merits. The facts are essentially undisputed and are set forth in a Joint Statement of Agreed Facts.

## BACKGROUND

### I. *The Statutory Scheme*

In 1970, the Rhode Island Legislature enacted the Rhode Island Insurers' Insolvency Fund Act, R.I.Gen.Laws § 27–34–1 *et seq.* (the "Act"), which created the Rhode Island Insurers' Insolvency Fund. The purpose of the Fund was to

provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, and to create an entity to assess the cost of such protection and distribute it equitably among member insurers.

R.I.Gen.Laws § 27–34–2. Insurers writing most kinds of direct insurance [2] within the state are required to belong to the fund and to participate in proportion to their respective shares of the insurance market. R.I.Gen.Laws §§ 27–34–3, 27–34–8. The Fund and its Plan of Operation are overseen by a Board of Directors selected by member insurers subject to the approval of the state insurance commissioner. R.I.Gen.Laws § 27–34–7.

The Act is patterned after model legislation drafted by the National Association of Insurance Commissioners (the "Model Act"). There are two alternative versions of the Model Act. The first version lumps all member insurers together in one account for purposes of administration and assessment. The second version separates member insurers into three different groups or accounts based on the types of insurance they write.

Rhode Island chose the second model and created separate accounts for: (1) workers' compensation insurance; (2) automobile insurance; and (3) all other lines of insurance. R.I.Gen.Laws § 27–34–6. Since some insurers write more than one type of coverage, they participate in more than one account.

In order to pay claims against an insolvent company, the Fund annually assessed each participating insurer an amount not exceeding two percent of that insurer's net premiums for the previous calendar year. R.I.Gen.Laws § 27–34–8. Such assessments were used only to pay claims against insolvent insurers belonging to the same account. Thus, generally speaking, companies writing one line of insurance were not assessed to pay claims against insolvent companies writing a different line of insurance. The Act also permitted insurers to recoup assessments paid to the Fund by including such amounts in their rate bases for the following year. R.I.Gen.Laws § 27–34–15.

### II. *The 1990 Amendment*

In March 1989, American Mutual Insurance Group ("American Mutual"), a member of the workers' compensation account, was declared insolvent. In order to pay workers' compensation claims against that company, the Fund began levying two percent annual assessments against members of the workers' compensation account. However, it soon became clear that those assessments were inadequate and that payments to injured workers would have to be reduced or eliminated unless additional revenues were generated. Consequently, the Fund's directors persuaded the Rhode Is-

---

**2.** The statute enumerates the kinds of insurance to which it applies. *See* R.I.Gen.Laws § 27–34–3.

land General Assembly to amend R.I.Gen. Laws § 27–34–8.

The amendment permitted the Fund to assess members of one account in order to pay claims against insolvent members of different accounts when intra-account assessments were insufficient for that purpose. 1990 R.I.Pub.Laws Ch. 19 § 1 (hereinafter "Public Law 90–19"). The amendment did not increase the two percent cap on assessments. Nor did it alter the provisions allowing insurers to recoup assessments by including them in their rate bases for following years.

When Public Law 19–90 was adopted, Metropolitan was a member of the Fund but not the workers' compensation account. Between May, 1990, and November, 1991, the Fund assessed Metropolitan a total of $254,011.00 to cover claims arising from American Mutual's insolvency. Metropolitan paid those assessments under protest.

As already noted, Metropolitan contends that Public Law 90–19 violates the due process, takings and equal protection clauses of the Fifth and Fourteenth Amendments. It further contends that Public Law 90–19 is unconstitutional because it conditions Metropolitan's ability to receive a license to engage in the property and casualty insurance businesses on the payment of the cross-account assessments. In addition, Metropolitan asserts two pendent state law claims based on alleged violations of the Rhode Island Constitution.

## DISCUSSION

### I. *Substantive Due Process*

The test for determining whether a statute satisfies the requirements of substantive due process depends on the nature of the rights the statute affects. Generally speaking, legislation dealing with social and economic regulation that does not implicate "fundamental rights" is unconstitutional under the due process clause only if it is

> "'arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt.'" *Pennell v. San Jose*, 485 U.S. 1 [11], 108 S.Ct. 849,

857, 99 L.Ed.2d 1 (1988) (quoting *Permian Basin Area Rate Cases*, 390 U.S. 747, 769–70, 88 S.Ct. 1344, 1361, 20 L.Ed.2d 312 (1968)). *Medical Malpractice Underwriting Ass'n v. Paradis*, 756 F.Supp. 669, 675 (D.R.I. 1991). Such statutes enjoy a presumption of constitutionality that casts a heavy burden on the party challenging them "to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976) (citations omitted); *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926). In determining whether that burden has been met, the relevant inquiry is not whether the claimant or the Court agrees with the legislative body's judgment. Rather, it is whether "a rational relationship exists between [the statute] and a legitimate governmental objective." *Tenoco Oil Co. v. Dept. of Consumer Affairs*, 876 F.2d 1013, 1021 (1st Cir.1989) (citing *Nebbia v. New York*, 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934)); *Medical Malpractice Joint Underwriting Association*, 756 F.Supp. at 675. As the Supreme Court has stated: "It is enough to say that [the statute] approaches the problem ... rationally; whether a broader ... scheme would have been wiser is not a question of constitutional dimension." *Usery*, 428 U.S. at 19, 96 S.Ct. at 2894.

In this case, there is no question that Public Law 90–19 serves a legitimate governmental objective, namely preserving public confidence in the insurance system and preventing injured workers from being deprived of the benefits to which they are entitled. *See Joint Statement of Agreed Facts*, at 9. Nor is there any question that a system of cross-account assessments constitutes a rational way in which to achieve that objective. As already noted, an alternative version of the Model Act contemplates a single account fund in which claims against one insolvent insurer are satisfied by assessments against all member companies without regard to the lines of coverage they write. That system has been adopted by a number of other states.

In fact, Metropolitan, itself, belongs to several of those one account funds. *Joint Statement of Agreed Facts*, at 3.

Metropolitan's substantive due process claim is based on the premise that Public Law 90–19 operates retroactively by requiring Metropolitan to pay assessments referable to events that occurred prior to the statute's enactment. It contends that such a system is so fundamentally unfair that it constitutes a denial of due process.

The Court finds that argument unpersuasive for several reasons. First, Public Law 90–19 is not retroactive legislation. The test for determining whether a statute operates retroactively is "whether the law changes the legal consequences of acts completed before its effective date." *Weaver v. Graham*, 450 U.S. 24, 41, 101 S.Ct. 960, 971, 67 L.Ed.2d 17 (1981). "[A] statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends are drawn from a time antecedent to its enactment." *Lohf v. Casey*, 466 F.2d 618, 620 (10th Cir.1972) (citations omitted); *See also Lewis v. Fidelity & Deposit Co.*, 292 U.S. 559, 571, 54 S.Ct. 848, 853, 78 L.Ed. 1425 (1934); *Morrison v. Lamarre*, 75 R.I. 176, 65 A.2d 217, 220 (1949).

The mere fact that Public Law 90–19 permits cross-assessments in order to pay claims against an insurer that became insolvent before the statute was adopted does not make it retroactive. Under Public Law 90–19, cross-assessments may be made only to the extent that assessments against insurers belonging to a particular account are insufficient to pay claims against that account. In other words, cross-assessments are triggered by the need to pay claims made in a given year rather than by the previous insolvencies that may have spawned those claims.

The assessments at issue in this case are referable solely to claims asserted or coming due during years *subsequent* to the statute's enactment. In addition, the assessments themselves have been made only for years *after* the effective date of the statute. No assessments have been authorized or made for years before Public Law 90–19 was adopted. Therefore, the statute operates prospectively rather than retrospectively despite the fact that some of the assessments it authorizes may relate to claims that are traceable to antecedent insolvencies.

Even if Public Law 90–19 could be characterized as having some retrospective aspects, that fact, alone, would not render it unconstitutional. It is true that substantive due process requires greater justification for legislation that operates retrospectively because of the possibility that such legislation may "upset[ ] otherwise settled expectations" or impose an unforeseen liability for "conduct ... taken in reliance upon the current state of the law." *See Usery*, 428 U.S. at 16–17, 96 S.Ct. at 2892–93. However, Metropolitan is unable to explain how Public Law 90–19 implicates either of those concerns.

Metropolitan cannot be viewed as having had any legitimate expectation that the Fund's method of assessment would remain unchanged because it certainly was aware that the insurance business is closely regulated and the laws applicable to it are subject to frequent revision. Even if Metropolitan had such an expectation, it has failed to explain how or why its past conduct was altered by that expectation. Metropolitan fails to identify what it did in reliance on the system of intra-account assessments that it cannot do under the system of cross-account assessments.

Finally, Metropolitan is unable to point to any unforeseen liability it has incurred as a result of any reliance on prior law. The two percent cap on assessments remains unchanged, and, as already noted, any cross-assessments are limited to years *subsequent* to the enactment of Public Law 90–19 and are referable only to claims made during those years. Moreover, Metropolitan retains its ability to recoup such assessments through the premiums it charges or to avoid them entirely by withdrawing from the market.

In short, Public Law 90–19 is not retroactive legislation. Nor is there anything irrational, arbitrary or capricious about the system of cross-assessments it authorizes.

*See Usery,* 428 U.S. at 18–19, 96 S.Ct. at 2893–94.

## II. *Taking Without Just Compensation*

■ The Fifth Amendment prohibits "taking" of private property for "public use" without "just compensation." That prohibition is applicable to the states through the operation of the Fourteenth Amendment's due process clause. *E.g., Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 175 n. 1, 105 S.Ct. 3108, 3111 n. 1, 87 L.Ed.2d 126 (1985); *Tenoco Oil Co.,* 876 F.2d at 1023. The purpose of the "takings" clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 227, 106 S.Ct. 1018, 1027, 89 L.Ed.2d 166 (1986) (citation omitted).

A determination as to whether the "takings" clause has been violated depends on the circumstances of the particular case. *Connolly,* 475 U.S. at 224, 106 S.Ct. at 1025. However, the Supreme Court has identified three factors that must be considered:

> (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action."

*Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026 (citations omitted).

In this case, any adverse "economic impact" suffered by Metropolitan as a result of cross-assessments is, at most, minimal. As already noted, Public Law 90–19 did not increase the cap on assessments to which Metropolitan was subject prior to the statute's enactment. More importantly it did not alter Metropolitan's right to fully recoup assessments it is required to pay by including them in its rate base for the succeeding year. In that respect, this case is readily distinguishable from *Medical Malpractice Underwriting Ass'n v. Paradis,* 756 F.Supp. 669 (D.R.I.1991), where

the method of reimbursement was uncertain, inadequate, and likely to be very protracted.

The fact that Metropolitan, thus far, has chosen not to include assessments in its rate base does not render Public Law 90–19 unconstitutional. The statute permits Metropolitan to promptly recover any assessments it is required to pay, in full, through the premiums it charges. Metropolitan's argument that competition within the insurance industry prevents it from increasing premiums is unsupported by either fact or logic. There is no apparent basis for Metropolitan's suggestion that it would suffer some unspecified form of competitive disadvantage by seeking to recoup assessments. On the contrary, all carriers writing similar lines of insurance presumably would belong to the same account and be subject to the same assessments as Metropolitan. Furthermore, as also noted, the system of cross-assessments at issue in this case did not interfere with any legitimate "investment-backed expectations" Metropolitan may have had.

Finally, as in *Connolly,* the character of the governmental action is such that the state cannot be said to have appropriated any of Metropolitan's assets for its own use. Rather, any interference with Metropolitan's property rights "arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and ... does not constitute a taking requiring Government compensation." *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026 (citations omitted).

## III. *Equal Protection*

■ The "equal protection" clause of the Fourteenth Amendment prohibits states from creating impermissible classifications that result in one group of individuals being treated less favorably than another group similarly situated. *Felice v. R.I. Board of Elections,* 781 F.Supp. 100, 105 (1991) (citing *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). Like the "due process" clause, the test to be applied in determining whether a statute satisfies equal protection requirements "de-

pends upon the kind of regulation involved; the criteria used in creating the classification and the nature of the governmental interest and individual rights at stake." *Felice*, 781 F.Supp. at 105. Regulation dealing solely with economic or social matters is evaluated under the rational basis test and will be upheld unless it lacks a rational relationship to a constitutionally permissible state purpose. *Felice*, 781 F.Supp. at 105 (citing *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 110, 69 S.Ct. 463, 465, 93 L.Ed. 533 (1949)). The relevant inquiry under the rational basis test is not whether the classification chosen represents the wisest method of achieving the desired goal. Rather, it is whether the legislature's judgment is at least arguably rational. *Smithfield Concerned Citizens for Fair Zoning v. Town of Smithfield*, 719 F.Supp. 75, 81 (1989) (citing *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926)).

Metropolitan argues that there is no rational basis for imposing the burden of paying claims against insolvent workers' compensation insurers on insurers that write other lines of insurance rather than on businesses in general or, even, the public, as a whole. The short answer to that argument is that although insurance companies may write different lines of insurance, there is a clear distinction between them and companies engaged in other businesses. Since the Fund can be used only to pay claims against insolvent *insurers* and promotes public confidence in the *insurance* industry, it is eminently reasonable to assess only *insurance* companies when replenishment of the fund becomes necessary.

Furthermore, given the fact that insurers frequently write more than one line of coverage, the insolvency of one carrier is likely to benefit other carriers by increasing their respective market shares, a benefit not shared by the business community or the public, in general. Indeed, that is precisely what happened here. Metropolitan's market share increased as a result of

American Mutual's insolvency. *Joint Statement of Agreed Facts*, at 17. Finally, adopting Metropolitan's reasoning would mean that insurance companies, in turn, should be assessed to pay claims against failed banks or other businesses, a policy that even Metropolitan presumably would oppose.

In sum, Metropolitan's argument that Public Law 90–19 fails the "rational basis" test is no more persuasive under equal protection analysis than it was under due process analysis.

## IV. *The State Law Claims*

Because there is no merit to the various federal claims asserted by Metropolitan, this Court has discretion to decline to exercise supplemental jurisdiction over Metropolitan's state law claims. 28 U.S.C. § 1367(c)(3). Indeed, since those claims involve nothing more than interpretations of the Rhode Island Constitution, considerations of comity and justice dictate that they be dismissed. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

## CONCLUSION

For all of the foregoing reasons, the clerk is directed to enter judgment in favor of the defendants with respect to Counts 1–4 and 6 [3] of the Complaint and dismissing Counts 7–9 without prejudice.

IT IS SO ORDERED.

---

3. Count 5 was previously withdrawn.