MIRIAM KAHALEKAI, SUSAN HALAS, WILLIAM NAKAMURA, DOROTHY MURAKAMI, FLORENCE MUROKI, MARION KALUAKINI, PATRICIA EVANS, ELLEN NAKAMOTO, VICTORIA G. AH SAM, ALMA TORRES, DOROTHY MENDONCA, GRAIL HOOGS, B. A. CARLIN, ETHEL TAKAKUA, DENNIS PALMER, WILLIAM HENNESY, M. KIM, B. KIM, HAROLD S. IIDA, NORA COOPER, MITORI OTA, MAMARU OTA, A. S. HEISHMAN, CELINE NISHIKI, MAX MAUIDE, K. GORING, G. RAOBERT CRAFT, KELLEY CORNS, LYNNE WACHTER, THELMA KAMIDOI, HENRY ITO, YOSHIE SUEHIRO, MACK NAKAMOTO, KINUE ITO, MATSUE KANEKO, MABEL TANAKA, DOMINGA YAELAS, MISAO NISHIKUNI, TAKAYO MUROGAWA, YOSHIKO TOKUOKA, RICHARD YABU, RAY CARVALHO, EUSEBIO DALIVA, CHOZEN KAMEYA, ANNE RAY, YVONNE PETRO, ELIZABETH LAKE, YUKIO WATANABE, MICHIYU KAWAMURA and KAREN ASATO RINGSTAD, Plaintiffs, *v.* NELSON DOI, Lieutenant Governor, State of Hawaii; President WILLIAM PATY, 1978 Hawaii Constitutional Convention; KAREN IWAMOTO, Chairperson of the Submission and Information Committee, 1978 Hawaii Constitutional Convention; and The 1978 Hawaii Constitutional Convention, Defendants

NO. 7216

and

THIRTY-FOUR VOTERS OF THE COUNTY OF MAUI, Plaintiffs, *v.* NELSON DOI, Lieutenant Governor, State of Hawaii; President WILLIAM PATY, 1978 Hawaii Constitutional Convention; KAREN IWAMOTO, Chairperson of the Submission and Information

Committee, 1978 Hawaii Constitutional Convention; and
the 1978 Hawaii Constitutional Convention, Defendants

NO. 7218

FEBRUARY 1, 1979

RICHARDSON, C.J., OGATA, MENOR AND
KIDWELL, JJ., AND RETIRED JUSTICE
KOBAYASHI FOR THE VACANCY.

OPINION OF THE COURT BY MENOR, J.

This is an original action seeking to invalidate the results of the November 7, 1978 general election dealing with amendments to the State Constitution presented to the electorate for its approval by the 1978 Constitutional Conven-

tion.[1] The lieutenant governor's Computer-Final Report on the results of the election shows that all of the proposed amendments passed by the necessary constitutional margin.[2] At issue, however, is whether the proposed amendments were submitted to the voters in the form and manner required by law.

Following its deliberations, the Convention adopted as the definitive expression of its conclusions a document entitled, "The Constitution of the State of Hawaii With the Amendments Proposed by the Constitutional Convention of 1978." This document was referred to the Convention Committee on Submission and Information. That committee proposed a form of resolution, which was adopted by the Convention (Resolution No. 30), in which it was provided that the proposed amendments be submitted for ratification at the November 7, 1978 general election, in the form of the ballot attached to the resolution. The attachments to the resolution consisted of the texts of the punch-card ballot and the informational booklet which were subsequently used in the general election.

The punch-card ballot listed 34 proposed amendments by short title. The ballot was divided into Parts A and B. Part A provided for a blanket "yes" or "no" vote on all proposed amendments. Part B provided for a "no" vote on each of the

---

[1] The 1978 Constitutional Convention was mandated by the voters in 1976, when the question, "Shall there be a convention to propose a revision of or amendments to the Constitution?" was placed on the general election ballot. Hawaii's first constitutional convention was held in 1950 when 63 delegates met to draft a document, which became official and operational when Hawaii became a state in 1959. Another convention was held in 1968 when 82 delegates met and proposed 23 amendments to the voters. The 1978 convention was attended by 102 delegates and the number of amendments offered to the electorate totalled 34.

[2] Article XV, § 2, in pertinent part, provides that "[t]he revision or amendments shall be effective only if approved at a general election by a majority of all the votes tallied upon the question, this majority constituting at least thirty-five percent of the total vote cast at the election." Most were approved by the electorate by substantial popular vote margins.

34 proposed amendments, the listing of which was preceded by a caption: "I VOTE *YES* ON EACH OF THE PROPOSED AMENDMENTS AS LISTED BELOW EXCEPT THAT I VOTE *NO* ON THE FOLLOWING:." Neither the effect of the proposed amendments nor the numbers of the amended articles and sections were set forth in the punch-card ballot. However, the ballot contained, preceding Parts A and B, the following:

"Please read instructions and information in the booklet *which is part of this ballot*. The full text of the proposed amendments on the ballot numbered 1-34, inclusive, is available for inspection in your voting unit." (Emphasis added)

The informational booklet attached to the resolution set forth, under the same numbers and short titles used in the punch-card ballot, brief descriptive material under the words "If adopted, this amendment provides:." With the exception of proposed amendments 24, 25 and 34, article and section numbers were set forth in parenthesis after each short title. For example, the descriptive material with respect to the first proposed amendment was headed:

1. 12 MEMBER JURY: CIVIL; CASE AMOUNT (Article I, Section 13 and 14)

The forms of the ballot and informational booklet, as printed and used in the election,[3] conformed to those attached to the resolution, except that article and section numbers were added, in the informational booklet, after the short titles of proposed amendments 24 and 25. No article or section numbers appeared beside the short title of proposed amendment 34, in either instance.

Copies of the full text of the revised Constitution were distributed to state and municipal officers, including all county clerks, on September 21, 1978. They were also distributed to the main and branch libraries of the state library

---

[3] See Appendices "A" and "B" attached to this opinion. They follow essentially the same format as those used in the 1968 election.

system at least two weeks before the election. The availability of the library copies for examination could have been ascertained by a phone call to the Convention office at a phone number made generally known by newspaper advertisements. No information was distributed to the general public with respect to the availability of the text of the revised Constitution at public libraries; however, a "Con-Con Summary" mailed by the Convention to the household of every registered voter in the State did advise voters that they could obtain exact wording of the amendments from the voter information center located at Convention headquarters in Honolulu.

Having completed its work on the proposed amendments, the Convention recessed on September 21, 1978. Between that date and the November 7, 1978 general election, the Convention, through its Committee on Submission and Information, implemented its plan for the education of the electorate concerning the proposed amendments.

It mailed to the household of every registered voter in the State a "Con-Con Summary" containing a digest of the proposed amendments. On October 29, 1978, it caused to be published an advertising supplement to the Sunday Star-Bulletin and Advertiser, as well as to the Hawaii Tribune Herald, The Maui News, and the Garden Island. Each of the sections of the revised Constitution which was identified by article and section number in the informational booklet used in the election was printed in full text in this supplement. Other amendments adopted by the Convention and reflected in the revised Constitution which was referred to the Committee on Submission and Information were not printed in the newspaper supplement. This supplement was followed by the publication of the summaries of proposed amendments 1-10 on October 30, 1978, summaries of proposed amendments 11-21 on November 1, 1978, and summaries of proposed amendments 22-34 on November 2, 1978. These summaries were published in the Honolulu Advertiser and the Honolulu Star-Bulletin, both of which are newspapers of general circulation within the State. These summaries were combined and

republished in these newspapers on November 5, 1978, as a two-page advertisement. This combined summary was also distributed to the Sun Press on Oahu, the Maui News, the Hawaii Tribune Herald, and the Garden Island for dissemination to their readers. These summaries contained relevant information on some of the amendments which were not reflected in the informational booklet or in the supplement.

Additionally, the Convention during this period provided for the publication of newspaper advertisements and of radio and television announcements referring interested persons to the Convention information center and its telephone number for answers to questions; for the establishment of a speakers bureau to make convention delegates available to interested organizations for talks explaining convention amendments; and for radio and television programs in which convention delegates discussed the proposed amendments. The office of the lieutenant governor also conducted a statewide voter education program designed to familiarize the electorate with the ballot and voting procedures. The Convention's final report on advertising expenditures shows that it expended a total of $140,627.43 to educate the public on the amendments prior to the general election.

I.

The initial issue raised by the pleadings is whether this court has jurisdiction to entertain the proceedings. We hold that we do. HRS Chapter 11, Part XI, vests in this court jurisdiction over the subject matter of this action. Moreover, this court is empowered "to make and award such judgments, decrees, orders and mandates, issue such executions and other processes, and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to it by law or for the promotion of justice in matters pending before it." HRS § 602-5(7).

"The power to ascertain the validity of changes in the constitution resides in the courts, and they have, with practical uniformity, exercised the authority to determine the validity of proposal, submission, or ratification of

change in the organic law. The question of the validity of the adoption of an amendment to the constitution is a judicial and not a political question." 16 Am.Jur.2d, *Constitutional Law*, § 43.

## II.

In considering the merits of the issues raised by the plaintiffs, we are to be guided by the cardinal principle of judicial review that constitutional amendments ratified by the electorate will be upheld unless they can be shown to be invalid beyond a reasonable doubt. *Keenan v. Price*, 68 Idaho 423, 195 P.2d 662 (1948); *City of Raton v. Sproule*, 78 N.M. 138, 429 P.2d 336 (1967). The burden of showing this invalidity is upon the party challenging the results of the election. And "[e]very reasonable presumption is to be indulged in favor of a constitutional amendment which the people have adopted at a general election." *City of Glendale v. Buchanan*, 578 P.2d 221, 224 (Colo. 1978). In *Keenan* the court, quoting from *State v. Cooney*, 70 Mont. 355, 225 P. 1007, 1009 (1924), said:

"[H]ere as always we enter upon a consideration of the validity of a constitutional amendment after its adoption by the people with every presumption in its favor: The question is not whether it is possible to condemn the amendment, but whether it is possible to uphold it, and we shall not condemn it unless in our judgment its nullity is manifest beyond a reasonable doubt." 195 P.2d at 667.

A corollary to the foregoing principle is the oft-stated proposition that "[t]he people are presumed to know what they want, to have understood the proposition submitted to them in all of its implications, and by their approval vote to have determined that [the] amendment is for the public good and expresses the free opinion of a sovereign people." *Larkin v. Gronna*, 69 N.D. 234, 285 N.W. 59, 63 (1939).

## III.

The basic thrust of the plaintiffs' arguments in this case is that the constitutional amendments in question were not

submitted to the electorate in the form and manner provided by law. More specifically, the plaintiffs contend in their initial argument that the form of the ballot was so irregular as to require the invalidation of the election. We disagree.

The Convention was authorized by the Constitution to determine the form of the ballot. Article XV, § 2. In its Standing Committee Report No. 99, it explained its reasons for adopting the ballot used in the election:

> "Your Committee considered submitting each of the proposed amendments as separate questions with a YES or NO vote. This would result in submitting to the people for ratification not less than 34 questions. Since a major problem to overcome is voter apathy, your Committee was concerned that many voters will not take the time to mark their YES votes but will mark only the question or questions that they are opposed to. For this reason your Committee has agreed that a way should be provided to the voter, if he or she wishes, to approve or reject each of the questions by one vote [Part A] or, if he or she wishes, to vote against one or more of the questions and to approve the balance [Part B]."

The irregularity charged by the plaintiffs is that the ballot contained an inherent bias towards a "yes" vote by making it more difficult to vote "no" than "yes," which in effect diluted the vote and denied the electorate their constitutional rights. They suggest that with this ballot, voter inertia would cause voters who were only slightly opposed to an amendment to permit their vote to be recorded in favor rather than to take the trouble to record a negative vote; and this, they argue, introduced into the election a subtle form of bias which was impermissible.[4]

---

[4] Almost any ballot can be said to have some bias. But this fact alone will not suffice to invalidate an election. The arrangement of names in alphabetical order on an election ballot, for example, must somewhat favor some candidates over others. Such a listing is not impermissible. See HRS § 11-115. The order in which amendments were listed on the ballot in this case could arguably have had a bias effect. But to require that a ballot must be wholly unbiased would result in the imposition of an impractical standard of perfection.

Where the ballot is in a form which produces a knowing and deliberate expression of voter choice, the vote satisfies the requirement of electoral approval. *Kohler v. Tugwell*, 292 F.Supp. 978 (D.La. 1968), *affirmed*, 393 U.S. 531. The voter here was given the choice of voting "yes" or "no" on any or all of the proposed amendments. He was clearly informed that he could vote for or against all amendments under Part A of the ballot, or he could divide his vote under Part B. If he chose to vote "no" on a question under Part B, he did so intending that his vote be divided and knowing how it would be counted. The significance of a negative vote on any proposition upon the remaining unanswered questions was obvious on the face of the ballot. At the beginning of Part B of the ballot, the following clearly appeared: "I VOTE *YES* ON EACH OF THE PROPOSED AMENDMENTS AS LISTED BELOW EXCEPT THAT I VOTE *NO* ON THE FOLLOWING: . . ."

In no sense can it reasonably be said that the voter was likely to be misled by the ballot language. *Cf. Wright v. Board of Trustees of Tatum Ind. Sch. Dist.*, 520 S.W.2d 787 (Tex. Civ. App. 1975). The essential requirement is that the ballot not be misleading. *Young v. Byrne*, 144 N.J.Super. 10, 364 A.2d 47 (1976). The fact that *mechanically*, as to Part B, it was easier for him to ratify rather than to reject any given proposition did not have the effect of rendering the ballot defective.

The contention that a ballot is defective because the form makes it easier for a voter to cast his vote for, rather than against, a particular proposition or candidate has been rejected by many courts. It is apparent from the cases that the historical progression in the development of election procedures by the various states has been from the voice vote to the secret casting of votes by the use only of official ballots, with the secret casting of unofficial ballots as an intermediate step. The term "party ticket" appears to have referred originally to a privately printed ballot containing only the names of the candidates put forward by a particular political party, which the voter dropped into the ballot box to record his vote. Cases arising around the end of the last century reveal a disposition

on the part of state legislatures, in providing for the use only of official ballots, to continue to facilitate the voting of straight party tickets by enabling the voter to do so by a single mark beside the name of the party. On the other hand, in order for him to divide his vote, he was required to mark the ballot in other ways which involved more time and trouble to the voter. Challenges to such ballots as treating candidates or voters unequally were rejected in *Todd v. Board of Election Commissioners*, 64 N.W. 496 (Mich. 1895); *Ritchie v. Richards*, 47 P. 670 (Utah 1896); *State ex rel. Runge v. Anderson*, 76 N.W. 482 (Wisc. 1898); *Morris v. Board of Canvassers*, 38 S.E. 500 (W. Va. 1901); *Oughton v. Black*, 61 A. 346 (Pa. 1905). More recently, a challenge to the use of a "master lever" on a voting machine to enable a voter to vote a party ticket by a single operation was rejected in *Morrison v. La Marre*, 65 A.2d 217 (R.I. 1949).

Parallel with these cases are those which deal with ballots which, similarly to that now before us, enabled the voter to vote his party's ticket on proposed constitutional amendments, as well as on candidates, by a single mark beside the name of the party while requiring him otherwise to vote separately on the amendments. Such ballots were upheld in *State v. Winnett*, 110 N.W. 1113 (Neb. 1907) and *State ex rel. Sheets v. Laylin*, 68 N.E. 574 (Ohio 1903).

A form of "scratch ballot" was in early use for obtaining electorate approval of proposed constitutional amendments. Such ballots presented the proposed amendment affirmatively. To cast a vote in favor of the amendment, the voter deposited the ballot unmarked. To vote against the amendment, the voter was required to erase or strike out the words proposing the amendment before depositing the ballot. It was argued that the deposit of an unmarked ballot did not affirmatively express approval of the amendment under state constitutions which required the expression of voter approval. Such challenges were rejected in *May & Thomas Hardware Co. v. Mayor, etc. of Birmingham*, 26 So. 537 (Ala. 1899), and *Atwater v. Hassett*, 111 P. 802 (Okla. 1910).

This body of authority rests, we believe, upon the principle that the motives of voters may not be inquired into where

their will has been expressed. If avoidance of the effort of casting a negative vote was sufficient reason for any number of voters to cast an affirmative vote, we cannot deny effect to their vote simply because we regard that reason as inadequate, misguided, or otherwise defective.[5] "Where the language and meaning of a constitutional amendment are clear, a determination of what inducements motivated voters in the adoption of the amendment [is] outside the scope of any judicial examination." *Carpenter v. State,* 179 Neb. 628, 139 N.W.2d 541, 545 (1966). *See also Detroit United Railway v. Detroit,* 255 U.S. 171, 178 (1921). We are not here concerned with a ballot which presented the proposition in such a manner as to mislead or improperly influence the decision of the voter on its merits, as in the cases cited by the plaintiffs. *See, e.g., Boucher v. Bormhoff,* 495 P.2d 77 (Alaska 1972); *Conley v. Hardwick,* 141 Ky. 136, 132 S.W. 140 (1910); *City of Newport v. Gugel,* 342 S.W.2d 517 (Ky. 1961).

In *Boucher* the state constitution provided for the submission to the people, at certain stated intervals, the question, "Shall there be a Constitutional Convention?" Pursuant to this mandate, the lieutenant governor of the state prepared a ballot which posed the question as follows:

"*As required by the Constitution of the State of Alaska . . .* Shall there be a constitutional convention?" (Emphasis added)

The court found the prefatory language inherently misleading, in that it implied that a constitutional convention was required to be held by the Alaska Constitution.

---

[5] The amicus brief of the Hawaii State Bar Association contends that the ballot failed to comply with Rule 2.3 E5 of the Rules and Regulations Governing Elections adopted by the Lieutenant Governor pursuant to HRS § 11-4. Authority to determine the form of the ballot by which the proposed amendments were submitted to the electorate for approval was conferred on the Convention by Article XV, Section 2, of the Hawaii Constitution and is not subject to the control of the legislature. Since we hold that the form of the ballot was not defective, we are not faced with the question of the effect to be given to a vote recorded by a defective ballot. Evidence offered by the plaintiffs with respect to the effect on voter motivation of the form of the ballot is accordingly irrelevant.

In *Conley* the Kentucky court invalidated a referendum election in which the issue was to permit or not permit the sale of intoxicants. The "Dry" column on the ballot was headed by a representation of the Bible and the "Wet" column by a drawing of a whiskey bottle with a snake protruding from its mouth. The court said:

> "The ballot is a means devised by law to secure a fair expression of the will of the people, and it should never contain devices that give to one side an undue advantage over the other. It was highly improper to use any devices at all, and absolutely inexcusable to use the devices referred to, or either of them." 132 S.W. at 141.

In *City of Newport* the election challenge concerned a ballot wherein the proposition to be voted was titled "Fair Pay Petition." The court found this to be in violation of the statutory mode for submitting such proposals and further said:

> "While the words 'fair pay petition' are mild and not calculated to arouse violent prejudices, nevertheless it is plain that they were put on the ballots and voting machine labels for propaganda purposes and with the thought that they would in fact influence the voters . . .

> \* \* \* \*

> ". . . It is our opinion that the use of the words 'fair pay petition' on the ballots and voting machine labels was such an impropriety as to invalidate the election." 342 S.W.2d at 519.

In each of these cases, the proposition was placed on the ballot in a form which implied a recommendation as to the vote. This was held to be an improper attempt to influence the election result and to invalidate the election. We do not find this to be the situation here.

IV.

Intimately related to the ballot bias issue is the question of duplicity. The plaintiffs argue, for example, that Question No. 1 on the ballot (12 Member Jury; Civil Case Amount)

ought to have been presented as two separate propositions instead of one, inasmuch as the question as presented contained two different subject matters: (1) a proposal to raise the minimum amount for jury trials in civil cases, and (2) a proposal to guarantee an accused, charged with a serious criminal offense, a jury of twelve persons. They contend that in this and in other similar respects, the ballot violated the prohibition against the incorporation of different subjects into a single ballot proposition. We disagree.

Unless otherwise provided in the Constitution,[6] there is no limitation on the number of subjects that may be included in a proposed constitutional amendment. *State v. Brown*, 10 Ohio St.2d 139, 226 N.E.2d 116 (1967); *Opinion of the Justices*, 335 So.2d 373 (Ala. 1976); *People v. Sours*, 31 Colo. 369, 74 P. 167 (1903). *See also City and County of Denver v. Mewborn*, 143 Colo. 407, 354 P.2d 155 (1960). There is nothing in the Hawaii Constitution that will support a reasonable conclusion that a single amendment to the constitution proposed by a constitutional convention can contain no more than one subject, purpose or object. And while Article III, § 15, of the Hawaii Constitution, expressly prohibits the enactment of legislation embracing more than one subject, such a proscription is not

---

[6] The cases cited by the plaintiffs on the issue of duplicity were decided on the basis of express constitutional provisions proscribing the inclusion of multiple subjects in a single ballot proposition. In Kerby v. Luhrs, 44 Ariz. 208, 36 P.2d 549 (1934), for example, the Arizona constitution expressly provided that "[i]f more than one proposed amendment shall be submitted at any election, such proposed amendments shall be submitted in such manner that the electors may vote for or against such proposed amendments separately." The modern test for duplicity is whether or not the propositions contained in the amendment are all germane to a common object and purpose. Idaho Water Resource Board v. Kramer, 97 Idaho 535, 548 P.2d 35, 52 (1976); Keenan v. Price, supra. An example of the application of this rule is to be found in Barnhart v. Herseth, 88 S.D. 503, 222 N.W.2d 131 (1974). There it was held that a constitutional amendment which made several changes in the executive branch of state government including, inter alia, extending the term of the governor, reducing the number of governmental departments, authorizing the governor to reorganize departments of government, and deleting the office of state superintendent of public instruction, contained matters all rationally related to the overall plan of making the executive branch of state government more efficient and responsible, and thus was properly submitted to the voters as one amendment.

applicable to constitutional amendments. *State v. Brown, supra; State v. Lyons,* 40 Del. 77, 5 A.2d 495 (1939); *Cooney v. Foote,* 142 Ga. 647, 83 S.E. 537 (1914); *Bonds v. State Department of Revenue,* 254 Ala. 553, 49 So.2d 280 (1950). Article XV, § 2, expressly authorizes the Convention to determine, in its discretion, the manner in which proposed amendments shall be submitted to a vote of the electorate. This particular provision has been in effect, unamended, since the adoption by the people of the original Constitution.

This broad authority vested in the Convention, however, is subject to the limitation that the ballot must enable the voters to express their choice on the amendments presented and be in such form and language as not to deceive or mislead the public.[7] *State v. Brown, supra; Kohler v. Tugwell, supra; Wright v. Board of Trustees of Tatum Ind. Sch. Dist., supra; Boucher v. Bormhoff, supra; Conley v. Hardwick, supra; City of Newport v. Gugel, supra.* By this standard, we are satisfied that with respect to the amendments which were properly submitted for voter approval, as determined in Part V of this opinion, the form and language of the ballot, which included the informational booklet, was in compliance with existing law. The form of the ballot in this case lay within the range of the possible choices which the Convention might have made in the exercise of authority granted to it by Article XV, § 2, of the Constitution. The fact that the electorate was presented with an array of complex amendments, to which they were asked to address themselves, does not create a presumption that the form of the ballot was misleading or defective and does not open the door to judicial inquiry into the state of mind of the voters. *See Kohler v. Tugwell, supra; Carpenter v. State, supra.*

---

[7] The ballot need not contain the full text of a proposed amendment. Tipton v. Smith, 229 S.C. 471, 93 S.E.2d 640 (1956). But in such case the ballot should contain "a description of the proposition submitted in such language as to constitute a fair portrayal of the chief features of the proposition, in words of plain meaning, so that it can be understood by persons entitled to vote . . . . [I]t is sufficient if enough is printed on the ballot to identify the matter and show its character and purpose." Wright v. Board of Trustees of Tatum Ind. Sch. Dist., supra, at 792.

## V.

The plaintiffs further assert, however, that the electorate was deprived of necessary information concerning the proposed amendments. This, as it now appears, is the determinative issue in this case. Stated more broadly, the question is whether the results of the election can be said to have been the mandate of an informed electorate.

Article XV, § 3, of the present Constitution, requires that legislatively initiated proposals be published "once in each of four successive weeks in at least one newspaper of general circulation in each senatorial district wherein such newspaper is published, within the two months' period immediately preceding the next general election."[8] There is no such requirement imposed for convention initiated amendments. The Convention, however, was required to inform the public of the contents and effect of the proposed amendments. *Cf. Kohler v. Tugwell, supra; City of Glendale v. Buchanan, supra.*

The burden upon the Convention of informing the electorate was especially heavy, but required, by reason of the number and complexity of the amendments proposed by it. Correlatively, however, it was incumbent upon members of the public to educate and familiarize themselves with the contents and effect of the proposed amendments before expressing themselves at the polls. *Kohler v. Tugwell, supra; Young v. Byrne,* 144 N.J.Super. 10, 364 A.2d 47 (1976). This was a non-delegable responsibility which was magnified, rather than diminished, by the number of complex amendments presented to them for their consideration. Thus, where information placed before the electorate is neither deceptive nor misleading, and they are given sufficient time within which to familiarize themselves with the contents and effect of the proposed amendments, they will be deemed to have

---

[8] It has been held that in such circumstances, a conclusive presumption that the electorate was aware of the terms of the amendment was thereby created. Opinion of the Justices, supra.

cast informed ballots. *See Kohler v. Tugwell, supra; McLennan v. Aldredge,* 223 Ga. 879, 159 S.E.2d 682 (1968); *City of Glendale v. Buchanan, supra; Barnhart v. Herseth, supra.*

The amendments in this case were given extensive coverage before the election. They were the subject of widespread publicity in the newspapers, and on radio and television. Summaries of the amendments were published in the newspapers, as well as in a "Con-Con Summary" which was mailed by the Convention to the residence of every registered voter in the State.[9] An advertising supplement which purported to contain the full text of the amendments was distributed through the newspapers in every county. The daily proceedings of the Convention were covered and regularly reported upon by the news media. Informational sessions regarding the ballot and voting procedures were conducted by the office of lieutenant governor for the benefit of the public. By these means and sources, the voter could have reasonably educated and familiarized himself with the significance and substance of the bulk of the proposed amendments before going to the polls. Further, the newspaper supplement was available at the polls for the voter's examination. The informational booklet which was made a part of the ballot also contained a digest of the amendments.

There were flaws in this procedure, however, which we have found fatal to certain of these amendments. We refer specifically to amendatory deletions and additions of a substantive nature which were not mentioned in both the informational booklet and the newspaper supplement. The vital significance of these omissions stems from the express representation of the Convention in its advertisements that the full text of the amendments would be made available to the public for its examination. To accomplish this objective, it caused to be published the newspaper supplement which, in bold type, informed the reader: "THE COMPLETE TEXT OF THE

---

[9] We think the "Con-Con Summary" was an excellent method of informing the voter of the proposed amendments. The Convention, however, could have devoted more space than it did to a comparative analysis of the substantive effect of the proposed amendments.

CONSTITUTIONAL AMENDMENTS IS CONTAINED IN THIS SUPPLEMENT.'' It did not in fact contain the full text of all of the proposed amendments. The public, however, was entitled to rely upon these Convention-inspired representations. It had the right to expect that the supplement which received statewide dissemination would contain, at the very least, the material substances of all of the proposed amendments. Thus, to the extent that the ballot (which included the informational booklet) and the supplement failed to reveal the substantive nature and effect of a proposed amendment, the voter will be deemed to have been uninformed with respect to that particular amendment. *Cf. Kohler v. Tugwell, supra.*

The omissions to which we address ourselves are those which have been called to our attention by the agreed statement of facts of the parties. In reviewing these omissions, we are confined to a consideration of whether the election resulted in a valid expression of the will of the electorate. The meaning and effect to be given to that expression are not among the issues presented to us. This limitation excludes from our consideration any interpretation of the constitutional amendments which we find to have been submitted to and approved by the electorate. We have determined that some of these omissions are fatal to certain of the proposed amendments. What significance such omissions may have in determining the meaning and effect of the amendments which were submitted and approved is outside the issues in this case, and upon such questions we express no opinion.[10]

A major omission of a substantive nature concerns the deletion, from the present Constitution, of Article X, § 5, which provides:

---

[10] We do not, for example, inquire into whether as a result of their adoption, other substantive changes in the Constitution have been effected by necessary implication. See People v. Sours, supra; McLennan v. Aldredge, supra; Keenan v. Price, supra. Neither are we here concerned with the effects of partial invalidation. See Carpenter v. State, supra.

## "FARM AND HOME OWNERSHIP

"Section 5. The public lands shall be used for the development of farm *and home ownership* on as widespread a basis as possible, in accordance with procedures and limitations prescribed by law." (Emphasis added)

This deletion, particularly with respect to the phrase "and home ownership," represents a fundamental change in constitutional philosophy regarding the use of public lands. To a home-starved populace which may fairly characterize the people of Hawaii, this change in emphasis is a substantive matter to which they were entitled to address themselves at the polls. They were not given the opportunity to do so. Accordingly, we hold that the amendment adopted by the Convention deleting present Article X, § 5, in its entirety was not validly ratified.

Another major omission of a substantive nature concerns New Article XII, § 7, which provides:

"The term 'Hawaiian' means any descendant of the races inhabiting the Hawaiian Islands, previous to 1778.

"The term 'native Hawaiian' means any descendant of not less than one-half part of the blood of races inhabiting the Hawaiian Islands previous to 1778 as defined by the Hawaiian Homes Commission Act, 1920, as amended or may be amended."

This proposed amendment to present Article XI (New Article XII) was not properly presented to the public for its consideration under Question No. 28 (Office of Hawaiian Affairs) and was, therefore, not validly ratified.

Several other relatively minor amendments of a substantive nature have also failed of ratification for the same reason. These concern the proposed amendments to Article III, § 2 and § 3;[11] the addition to New Article IV, § 5, of a new

---

[11] The proposed amendments to Article III, § 2 and § 3 are as follows [new material underlined and deleted material in brackets]:

"Section 2. The senate shall be composed of twenty-five members, who shall be elected by the qualified voters of the respective senatorial districts. [Until the

paragraph numbered 9;[12] the proposed amendment to Article XVI, § 1 (New Article XVIII, § 1);[13] and the deletion of that portion of Article III, § 4, entitled "Minimum Representation for Basic Island Units."[14]

On the other hand, we find the proposed amendment to Article III, § 10 (presently Article III, § 11), which was presented to the public under Question No. 7 (Legislative Terms, Functions and Procedures; etc.), to have been validly ratified. While the full text of the amendment was not contained in the supplement, the summaries of the proposal in both the informational booklet and the supplement fairly and sufficiently advised the voter of the substance and effect of the proposed amendment. See Kohler v. Tugwell, supra. New

---

next reapportionment the] *The* senatorial districts and the number of senators to be elected from each shall be as set forth in the [Schedule.] *reapportionment plan as established by the reapportionment commission.*"

"Section 3. The house of representatives shall be composed of fifty-one members, who shall be elected by the qualified voters of the respective representative districts. [Until the next reapportionment, the] *The* representative districts and the number of representatives to be elected from each shall be as set forth in the [Schedule.] *reapportionment plan as established by the reapportionment commission.*"

[12] Proposed New Article IV, § 5, par. 9, provides:
"No consideration shall be given to holdover senators in effecting redistricting."

[13] Proposed New Article XVIII, § 1, provides:
"Until the next reapportionment *the senatorial districts and the number of senators to be elected from each* shall be as set forth in the 1973 reapportionment plan. Until the next reapportionment the representative districts and the number of representatives to be elected from each shall be as set forth in the 1973 reapportionment plan."

[14] The following is the proposed deletion from Article III, § 4:
"MINIMUM REPRESENTATION FOR BASIC ISLAND UNITS
"The representation of any basic island unit initially allocated less than a minimum of two senators and three representatives shall be augmented by allocating thereto the number of senators or representatives necessary to attain such minimums which number, notwithstanding the provisions of Sections 2 and 3 of this article shall be added to the membership of the appropriate body until the next reapportionment. The senators or representatives of any basic island unit so augmented shall exercise a fractional vote wherein the numerator is the number initially allocated and the denominator is the minimum above specified."

Article III, § 10, as thus amended, reads as follows:

"Each regular session shall be recessed for not less than five days at some period between the twentieth and fortieth days of the regular session. The legislature shall determine the dates of the mandatory recess by concurrent resolution. Any session may be recessed by concurrent resolution adopted by a majority of the members to which each house is entitled. Saturdays, Sundays, holidays, the days in mandatory recess and any days in recess pursuant to a concurrent resolution shall be excluded in computing the number of days of any session."

We also find the purely stylistic and technical changes embodied in Question No. 34 (Technical & Style Changes), to have been validly ratified.[15] These changes consist of the substitution of words of similar meaning for those appearing in the existing Constitution. For example, "as provided by law" appears instead of "in accordance with law," "prescribed" instead of "provided," "shall serve as chairperson" instead of "shall chair," "provided for" instead of "made," and the like. In addition, words such as "the person's" are substituted for "his," "oneself" for "himself," "the accused" for "him," and the like. Numerous changes are made in punctuation and grammar. To require the publication of these non-substantive amendments in full would have been superflous and would have required the publication of the entire Constitution. It would appear from a reading of the Convention's standing committee report that only the "PREAMBLE" and "FEDERAL CONSTITUTION ADOPTED" portions of the present Constitution were left untouched by the committee's stylistic surgery.[16]

---

[15] The obvious purpose of the amendment is comparable, on a constitutional level, to the duty of the state's revisor of statutes under HRS §§ 2-6 and 2-10 to ensure, where possible, consistency throughout the statutory scheme in manner and style. However, the revisor may not, in making such revisions, alter the sense, meaning or effect of any act. *Id.*

[16] In moving for the adoption of Standing Committee Report No. 104, Delegate Hamilton informed the Convention:

". . . Finally, we really were engaged — the Committee on Style — with two functions. The first was the fairly traditional one which had been true in previous

There appears to be, however, other amendments of a substantive nature which are not readily apparent from the committee report. In Question No. 34, the electorate was asked to approve certain unspecified "changes [in] the Constitution where the subject may now be unconstitutional or unnecessary under the Constitution of the United States." This was too broad and vague a request, especially since it involved changes in the fundamental law. However valid the Convention's reasons might have been, it was for the people, based upon adequate information, to determine whether and to what extent the organic law of the State ought to undergo revision.

The question of whether any amendment submitted for approval by Question No. 34 was in fact approved thus depends on its effect upon substantive law. If the amendment is purely stylistic and technical in nature, and does not alter the sense, meaning or effect of any provision of the Constitution, it was approved by the electorate and has become a part of the revised Constitution. On the other hand, if the amendment alters the sense, meaning or effect of any provision of the Constitution, it was not ratified and is not effective to change the language of the Constitution. Obviously, we are not now in a position to make these line by line determinations. Neither are we presently concerned with the meaning and effect of any of the amendments proposed by the Convention.

Finally, as to all of the other amendments presented to the people by the 1978 Constitutional Convention for their approval, we find that constitutional publication and balloting

---

conventions, and this involved style, phraseology, consistency, capitalization, punctuation and so on. We also, of course, were responsible for and had arranged the various articles in what seemed proper and logical order. The Committee on Style this time had two new functions given to it by the Convention. One was to rid the Constitution of discriminatory pronouns, adjectives and any other terms, and that has been done.

"The second thing was to restyle the entire Constitution, which had not been done since 1950. That, too, has been done. Thus the entire document is consistent in terms of punctuation, capitalization and so forth. Mr. President, I would recommend its adoption."

requirements have been satisfied. Accordingly, we hold that these proposed amendments have been ratified.

*Steven B. Songstad* for plaintiffs.

*James Funaki* for defendants William Paty and Karen Iwamoto.

*Maria Sousa,* Deputy Attorney General for defendant Lieutenant Governor Doi.

*Daral G. Conklin and Melvin M. M. Masuda* for Hawaii State Bar Association, amicus curiae.

### CONCURRING AND DISSENTING OPINION OF KIDWELL, J.

I join without reservation in most of what is said in the court's opinion, but am unable to agree that either the amendatory language appearing in Article III, Section 10 of the constitution as revised by the Convention, or the amendments purportedly presented under Question No. 34, were approved at the general election as required by Article XV, Section 2 of the constitution.

The procedure for amending the constitution provided by Article XV, Section 2 gives no effect to the proposal of amendments by a convention unless they are submitted to the electorate for approval. I do not dispute the proposition that submission of proposed amendments may be accomplished without placing the text of the amended constitution physically before each voter in the polling place. The opinion analyzes the steps taken to inform the voters prior to the election with respect to the effect of the proposed amendments, on the premise that those steps constituted a part of the process of submission of the amendments, rather than only a process designed to acquaint the voters with what was submitted. This is, in my opinion, an incorrect view of what was taking place.

The definitive action of the Convention, by which it settled upon the proposed amendments and determined the manner of their submission, was the adoption of Resolution No. 30. By this resolution the Convention resolved:

That the proposed amendments to the Constitution be submitted to the people of the State of Hawaii in the form

of the ballot attached hereto for ratification or rejection at the general election to be held on the 7th day of November, 1978. . . . *Such submission shall be by ballot and shall be conducted and the results thereof determined in conformity with Section 2, Article XV of the Constitution. The ballot for such submission . . . . shall be substantially in the form hereto attached . . . .* (Emphasis added)

The form of ballot attached to Resolution No. 30 contains this significant communication to each voter:

Please read instructions and information in the booklet which is part of this ballot. The full text of the proposed amendments on the ballot numbered 1-34, inclusive, is available for inspection in your voting unit.

Resolution No. 30 was presented to the Convention by a report of its Committee on Submission and Information, which report was adopted by the Convention. The report recited that the amendments were too complex and lengthy to be listed on the ballot, and stated:

The numbers and the proposed amendments will be keyed to an explanatory booklet which will accompany the ballot card and also to a complete text of Constitutional changes displayed in each voting unit.

The report also stated that "full texts of the Constitution will be placed at the voter unit, thereby enabling voters who are not completely prepared an adequate opportunity to examine and review the proposed amendments and the revised Constitution as a whole."

The committee report proposed a public information program of the nature of that which was in fact conducted and which is described in the court's opinion. Authorization to conduct this informational program was given to the committee by adoption of the committee report. However, nothing in the committee report suggests authorization to change the manner of submission of the amendments to the voters which is provided in Resolution No. 30.

For reasons which are not significant to our present inquiry, the procedure prescribed in Resolution No. 30 for

submission of the proposed amendments to the electorate was not followed precisely. The full text of all of the proposed amendments was not made available in the polling places. Instead, copies of the newspaper supplement which had been published on October 29, 1978 were distributed to and were available for examination in each of the polling places. Notwithstanding the representation made in the supplement that it contained the full text of the proposed amendments, the text of the amendments which are now in question was omitted and was not available for voter inspection. I am unable to dismiss this as an immaterial departure from the manner of submission which was determined upon by the Convention. Had the text of none of the amendments been made available to the voters at the polling places, the departure from the prescribed manner of submission would have been striking and difficult to disregard. Yet as to each of the amendments the text of which was omitted from the material delivered to the polling places the departure is equally striking. I am forced to the conclusion that, as to those amendments, a submission to the voters in a manner determined by the Convention did not take place and those amendments did not receive voter approval.

The mechanical test which I would apply to determine which amendments became a part of the constitution may appear to elevate form over substance. The effort of the majority to find a different solution, however, places us in an uneasy position of uncertainty as to the precise wording of our fundamental law. The court's opinion makes the effect of the affirmative vote on Question No. 34 a question for inquiry whenever the meaning of the constitution is sought. I would avoid that result, and place our determination on what I consider to be a sounder rationale, by holding that voter approval extended only to the amendments contained in full text in the newspaper supplement.

# APPENDIX "A"

**B**

STATE OF HAWAII — TOP

**GENERAL ELECTION**
TUESDAY, NOVEMBER 7, 1978
AMENDMENTS TO THE STATE
CONSTITUTION PROPOSED BY THE
1978 CONSTITUTIONAL CONVENTION

146881

**(OVER)**

This stub shall be removed by the Election Official only

STATE OF HAWAII — TOP

**GENERAL ELECTION**
TUESDAY, NOVEMBER 7, 1978
AMENDMENTS TO THE STATE
CONSTITUTION PROPOSED BY THE
1978 CONSTITUTIONAL CONVENTION

**CONTINUED FROM OTHER SIDE**

This stub shall be removed by the Election Official only

Please read instructions and information in the booklet which is part of this ballot. The full text of the proposed amendments on the ballot numbered 1-34, inclusive, is available for inspection in your voting unit.

**VOTE ONLY IN PART A OR PART B**
**DO NOT VOTE IN MORE THAN ONE PART**

**PART A**

ON ALL PROPOSED AMENDMENTS AS LISTED UNDER PART B, I VOTE:

| | | |
|---|---|---|
| | YES | + |
| | NO | + |

**OR**

**PART B**

I VOTE YES ON EACH OF THE PROPOSED AMENDMENTS AS LISTED BELOW EXCEPT THAT I VOTE NO ON THE FOLLOWING:

| | | |
|---|---|---|
| 1. 12 MEMBER JURY; CIVIL CASE AMOUNT | NO | + |
| 2. INDEPENDENT GRAND JURY COUNSEL | NO | + |
| 3. RIGHT TO PRIVACY | NO | + |
| 4. OPEN PRIMARY ELECTION | NO | + |
| 5. RESIGNATION OF CANDIDATES FOR PUBLIC OFFICE | NO | + |
| 6. ELECTIONS; PARTIAL PUBLIC FINANCING; SPENDING & CONTRIBUTION LIMITS | NO | + |
| 7. LEGISLATIVE TERMS; FUNCTIONS & PROCEDURES; SALARY COMMISSION | NO | + |
| 8. REAPPORTIONMENT PROCEDURES | NO | + |
| 9. EXECUTIVE DEPARTMENTS; TERM LIMITS | NO | + |
| 10. COURTS; JUDICIAL SELECTION; DISCIPLINE | NO | + |
| 11. STATE SPENDING LIMIT; TAX REFUND | NO | + |
| 12. DEBT LIMITATION; EXCLUSIONS | NO | + |
| 13. SPECIAL PURPOSE REVENUE BONDS | NO | + |

**CONTINUED ON OTHER SIDE**
**(OVER)** 1203

Please read instructions and information in the booklet which is part of this ballot. The full text of the proposed amendments on the ballot numbered 1-34, inclusive, is available for inspection in your voting unit

| | | |
|---|---|---|
| 14. REVENUES; BUDGET; POST-AUDIT | NO | + |
| 15. TAX REVIEW & TAX CONFORMANCE | NO | + |
| 16. COUNTY POWER TO TAX REAL PROPERTY | NO | + |
| 17. PUBLIC HEALTH & WELFARE | NO | + |
| 18. POPULATION GROWTH MANAGEMENT | NO | + |
| 19. BOARD OF EDUCATION | NO | + |
| 20. EDUCATION; HAWAIIAN STUDIES | NO | + |
| 21. UNIVERSITY BOARD OF REGENTS | NO | + |
| 22. WATER RESOURCES; PROTECTION & CONTROL | NO | + |
| 23. ENVIRONMENT & RESOURCE PROTECTION | NO | + |
| 24. LAND MANAGEMENT; AGRICULTURAL LAND | NO | + |
| 25. CONTROL OF MARINE RESOURCES | NO | + |
| 26. RESTRICTIONS ON NUCLEAR ENERGY | NO | + |
| 27. DEPARTMENT OF HAWAIIAN HOME LANDS | NO | + |
| 28. OFFICE OF HAWAIIAN AFFAIRS | NO | + |
| 29. TRADITIONAL & CUSTOMARY RIGHTS | NO | + |
| 30. CODE OF ETHICS | NO | + |
| 31. PREAMBLE; STATE BOUNDARIES & MOTTO | NO | + |
| 32. LIMITS ON ADVERSE POSSESSION | NO | + |
| 33. MISCELLANEOUS REVISIONS | NO | + |
| 34. TECHNICAL & STYLE CHANGES | NO | + |

**(OVER)**

350

# APPENDIX "B"

## AMENDMENTS TO THE STATE CONSTITUTION
## PROPOSED BY THE 1978 CONSTITUTIONAL CONVENTION

November 7, 1978—State of Hawaii

---

**PLEASE READ THIS INFORMATIONAL BOOKLET
IT IS PART OF YOUR OFFICIAL BALLOT**

---

All amendments proposed by the 1978 Constitutional Convention have
been incorporated into proposals 1-34 in Part B of the ballot.
A brief description of each of the proposed amendments is contained
in this booklet. The Constitutional amendments are available
for your inspection in your voting unit.

## VOTING INSTRUCTIONS

Vote only in Part A or Part B of your Constitutional Convention Ballot.
**DO NOT VOTE IN BOTH PARTS OF THE BALLOT.**

**PART A:** Vote YES in Part A if you approve of **ALL** the amendments proposed by the Constitutional Convention.

**OR**

Vote NO in Part A if you disapprove of **ALL** the amendments proposed by the Constitutional Convention.

**PART B:** Vote in Part B if you approve of some amendments but disapprove of other amendments proposed by the Constitutional Convention. Select those amendments that you **disapprove** of and vote NO on those selections. Your vote on all other questions will be counted as YES.

## AMENDMENTS 1-34 PROPOSED BY CONSTITUTIONAL CONVENTION

**1. 12 MEMBER JURY; CIVIL CASE AMOUNT** (Article I, Section 13 and 14)

If adopted, this amendment provides that:

- a person can have a jury trial in a civil case where the amount in question is $1,000 or more rather than $100 or more as it now reads.
- a person shall have a 12 member jury in a criminal jury trial.

**2. INDEPENDENT GRAND JURY COUNSEL.** (Article I, Section II)

If adopted, this amendment provides:

- an independent lawyer to advise the grand jury.
- a way to choose those lawyers, and requires that the legislature set their pay and how long they shall work.

**3. RIGHT TO PRIVACY.** (Article I, Section 6)

If adopted, this amendment:

- adds a new section on the right to privacy for people to do certain personal things, and controls the use of some personal information about themselves.
- directs the legislature to carry out this section.

**4. OPEN PRIMARY ELECTION.** (Article II, Section 4)

If adopted, this amendment:

- allows a person to vote in any election without letting anyone know what party he or she prefers.
- keeps each person's party preference a secret.

**5. RESIGNATION OF CANDIDATES FOR PUBLIC OFFICE.** (Article II, Section 7)

If adopted, this amendment:

- makes any elected public officer who wants to run for another office quit before running for any other office if the terms of office are not the same.

**6. ELECTIONS; PARTIAL PUBLIC FINANCING; SPENDING AND CONTRIBUTION LIMITS.** (Article II, Sections 5, 6 and 8)

If adopted, this amendment provides that the legislature shall:

- create a campaign fund to pay part of the cost of state and local political campaigns for public office.
- set a spending limit for all candidates.
- limit the amount a person may give to any candidate or legal campaign group.
- require primary election to precede general election by 45 or more days.

**7. LEGISLATIVE TERMS, FUNCTIONS AND PROCEDURES; SALARY COMMISSION** (Article III, Sections 9, 12 and 15; Article XVIII, Section 2; Article IV, Sections 6 and 7)

If adopted, this amendment:

- requires the appointment of a legislative salary commission on November 30, 1978 and every 8 years from then on to set legislative salaries which will go into effect for the following legislature unless the governor or the legislature disapproves.
- makes the legislature set a deadline for all bills to be introduced and also requires a recess after the deadline of not less than 5 days between the 20th and 40th session day.

- opens to the public all decision making meetings of legislative committees.
- increases the waiting period required between the time when the printed bill is distributed and its third or final reading from 24 hours to 48 hours.
- staggers the terms of office of senators starting from the 1978 general election so that about half of the senators will be elected at each general election.
- provides for placement of holdover senators and method of keeping the staggered terms for the senate upon reapportionment.

**8. REAPPORTIONMENT PROCEDURES.** (Article IV, Sections 1, 2 and 8)

If adopted, this amendment:

- increases the time between the changing of boundaries for voting area from 8 to 10 years beginning in 1981.
- allows the commission 30 more days (from 120 to 150 days) in which to file its reapportionment plan
- requires the reapportionment commission to also reapportion the United States Congressional districts.

**9. EXECUTIVE DEPARTMENTS; TERM LIMITS.** (Article V, Sections 1, 2 and 6, Article XVIII, Section 4)

If adopted, this amendment:

- limits the governor and lieutenant governor to two terms in a row beginning this year.
- puts units with similar purposes and functions in the same executive department.

**10. COURTS; JUDICIAL SELECTION; DISCIPLINE.** (Article VI, Section 1, 2, 3, 4 and 5, Article XVIII, Section 5)

If adopted, this amendment:

- creates an intermediate court of appeals, and makes district courts a constitutional rather than legislative creation.

- makes courts limit the time they have to finish their cases.

- removes minimum salaries for judges from the constitution and creates a salary commission.

- requires judges to be State of Hawaii residents and citizens of the State and the United States who are licensed attorneys.

- adds a judicial selection commission to recommend judges for the supreme court, court of appeals or circuit court who are then picked by the governor and approved by the senate, or judges for district courts who are picked by the chief justice of the supreme court.

- gives the supreme court more power to discipline judges and starts a judicial discipline commission.

**11. STATE SPENDING LIMIT; TAX REFUND.** (Article VII, Sections 4, 5, 8, 8 and 9; Article VIII, Section 5)

If adopted, this amendment:

- limits State general fund spending to the estimated rate of growth of the State's economy and applies the limit to the governor's budget and legislative appropriations.

- gives taxpayers a refund or credit whenever the general fund balance is more than five percent of general fund revenues for two years in a row.

- prohibits deficit spending unless the governor says that the public health, safety or welfare is threatened.

- requires the State to share in the cost of any new programs or increased services which the legislature requires that counties provide.

**12. DEBT LIMITATION; EXCLUSIONS.** (Article VII, Sections 11 and 13)

If adopted, this amendment:

- limits the principal and interest on State debt to a percentage of general fund revenues.

- keeps the legislature from approving more bonds than are allowed under the debt limit.

- requires that each general obligation bond be repaid within twenty-five years.

- excludes certain bonds from the State and county debt limits.

- automatically cancels appropriations financed by general obligation bonds or general funds if not under contract or spent within three years.

**13. SPECIAL PURPOSE REVENUE BONDS.** (Article VII; Sections 12 and 13)

If adopted, this amendment:

- allows the legislature, by a two-thirds vote of each house, to pass enabling legislation to authorize issuance of special purpose revenue bonds if the issuance of such bonds is found to be in the public interest by the legislature.

- allows the issuance of special purpose revenue bonds for manufacturing, processing or industrial enterprises, utilities serving the general public, health care facilities provided to the public by non-profit corporations, and low and moderate income government housing programs.

- requires a second two-thirds vote of each house of the legislature before bonds can be issued for any project or program.

- requires that State credit cannot be used directly or indirectly and State shall not be liable for repayment of bonds.

- allows the legislature to authorize the counties to issue such bonds but requires a two-thirds vote of the county council before such bonds may be issued.

- excludes such bonds from the State or county debt limits.

**14. REVENUES; BUDGET; POST-AUDIT.** (Article VII, Sections 7, 8 and 10)

If adopted, this amendment:

- establishes a council on revenues to prepare State revenue estimates and requires the governor and legislature to consider such estimates in developing the State budget and making appropriations.

- provides for direct submission by the judiciary of its budget to the legislature.

- clarifies State auditor's duty to include post-audits of programs and performance of State agencies.

**15. TAX REVIEW AND TAX CONFORMANCE.** (Article VII, Sections 2 and 3)

If adopted, this amendment:

- allows the legislature to conform all or any portion of the State income tax laws to the federal income tax law.

- establishes a tax review commission to evaluate the State's tax structure and recommend revenue and tax policy.

**16. COUNTY POWER TO TAX REAL PROPERTY.** (Article VIII, Sections 3 and 5, Article XVIII, Section 6)

If adopted, this amendment

- grants the counties the exclusive power to exercise all functions, powers and duties relating to the taxation of real property

- includes a transitional section which provides (1) for effective date on July 1, 1981, (2) for uniform policies and methods of assessing real property by agreement of a majority of the counties or, in the absence of such agreement, by general law, and (3) for dedications of land for specific use, for assessment at its value in such use, and for real property tax exemptions, both of which shall not be altered for a period of eleven years, except that increases for either may be granted by agreement of a majority of the counties.

**17. PUBLIC HEALTH AND WELFARE.** (Article IX, Sections 2, 3, 4, 7, 8, 9 and 10)

If adopted, this amendment:

- allows flexibility in programs for care of handicapped.

- gives the legislature power to establish eligibility standards for public assistance.

- deletes the power to conserve and develop natural beauty which is shifted to Article on Conservation and Development of Resources.

- authorizes the State to provide for (1) public safety, (2) security of the elderly, (3) preservation of cultural resources, and (4) promotion of a healthful environment.

**18. POPULATION GROWTH MANAGEMENT.** (Article IX, Section 6)

If adopted, this amendment:

- requires the State and its counties to plan and manage the growth of the population except that each county may plan and manage their growth in a more restrictive manner than the State

**19. BOARD OF EDUCATION.** (Article X, Sections 2 and 3; Article XVIII, Section 7)

If adopted, this amendment:

- beginning with the 1980 general elections, members of the board of education will be elected in a nonpartisan manner from two at-large school board districts, one district for Oahu and the second district for the neighbor islands Each school board district will consist of several departmental school districts.

- provides that at least one member of the board of education live in each departmental school district.

- provides that the board of education has jurisdiction, subject to general laws, over the internal organization and management of the public school system

**20. EDUCATION; HAWAIIAN STUDIES.** (Article X, Sections 1 and 4)

If adopted, this amendment:

- prohibits discrimination in public educational institutions on the basis of sex.

- provides for the promotion of Hawaiian history, culture, and language and a Hawaiian education program.

**21. UNIVERSITY BOARD OF REGENTS.** (Article X, Section 6)

If adopted, this amendment:

- clarifies the board of regents' exclusive jurisdiction, subject to statewide laws, over the internal organization and management of the University of Hawaii.

**22. WATER RESOURCES; PROTECTION AND CONTROL.** (Article XI, Section 7)

If adopted, this amendment:

- obligates the State to protect, control, and regulate the uses of Hawaii's water resources for the benefit of the people of Hawaii.

- requires the legislature to insure that there is a water resources agency to help protect, control, and regulate the water.

**23. ENVIRONMENT AND RESOURCE PROTECTION.** (Article XI, Sections 1 and 9)

If adopted, this amendment:

- requires the State and counties to conserve and protect the natural beauty and natural resources of Hawaii.

- requires the State to promote the development and use of these resources in a manner consistent with conserving these resources and promoting the self-sufficiency of the State.

- requires the State to hold all public natural resources in trust for the benefit of the people of Hawaii.

- gives each person the right to a clean and healthful environment as defined by law.

- gives each person the right to sue to enforce this right but the legislature may limit and regulate this right in a reasonable manner.

**24. LAND MANAGEMENT; AGRICULTURAL LAND.** (Article XI, Sections 3 and 4)

If adopted, this amendment:

- requires the State to conserve and protect agricultural lands, promote diversified agriculture, increase agricultural self-sufficiency, and assure that agriculturally suitable lands will be available

- requires the State to identify which agricultural lands are needed to promote the future of agriculture.

- requires that lands identified as important for agriculture shall not be used for any other purpose unless certain standards and criteria set by the legislature are met and approved by a two-thirds vote of the governmental body which is to approve changes in the use of the land.

- permits the State to acquire interests in real property in order to control development and land use; deems exercise of such power to be for a public use and purpose.

**25. CONTROL OF MARINE RESOURCES.** (Article XI, Section 6)

If adopted, this amendment:

- gives the State the power to manage and control the ocean waters and lands which are located within the boundaries of the State

- reserves to the State the right to manage and control ocean waters and lands which are located outside the boundaries of the State as long as federal or international law does not prevent the State from doing so.

- adds to the list of areas not open to the public, those areas where a state-licensed mariculture operation is operating but requires the legislature to establish guidelines for mariculture operations to protect the public's use and enjoyment of the reefs.

**26. RESTRICTIONS ON NUCLEAR ENERGY.** (Article XI, Section 8)

If adopted, this amendment:

- requires anyone wishing to construct a nuclear fission power plant or dispose of radioactive material to receive the approval of two-thirds of the members of each house of the legislature.

**27. DEPARTMENT OF HAWAIIAN HOME LANDS.** (Article XII, Section 1; Hawaiian Homes Commission Act, 1920, as amended, Sections 204, 212, 213 and 221)

If adopted, this amendment:

- requires the legislature to fund the Department of Hawaiian Home Lands.

- guarantees that traditional funding continue.

- allows Department more flexibility.

**28. OFFICE OF HAWAIIAN AFFAIRS.** (Article XII, Sections 4, 5 and 6)

If adopted, this amendment:

- sets forth the trust corpus and beneficiaries of the Admission Act.

- establishes an Office of Hawaiian Affairs with an elected board of trustees and provides for an effective date

**29. TRADITIONAL AND CUSTOMARY RIGHTS.** (Article XII, Section 8)

If adopted, this amendment.

- allows descendants of native Hawaiians, subject to state regulation, to exercise rights that have been customarily and traditionally exercised.

**30. CODE OF ETHICS.** (Article XIV)

If adopted, this amendment:

- extends ethics codes to constitutional convention delegates and employees.

- provides that ethics codes must require provisions for financial disclosure.

- requires an independent commission to supervise ethics codes.

- requires lobbyist registration.

- requires candidates for political office to file financial disclosures

**31. PREAMBLE; STATE BOUNDARIES AND MOTTO.** (Preamble, Article XV, Sections 1, 4 and 5)

If adopted, this amendment:

- revises the Preamble.

- affirms that the State's boundaries include the waters around all the State's islands.

- picks a State motto and official languages of English and Hawaiian.

**32. LIMITS ON ADVERSE POSSESSION.** (Article XVI, Section 12)

If adopted, this amendment:

- eliminates the acquiring of title to real property by adverse possession, except that five acres or less may be claimed by adverse possession, but not more than once in 20 years.

**33. MISCELLANEOUS REVISIONS.** (Article XVI, Sections 3 and 13; Article XVII, Section 2)

If adopted, this amendment.

- would keep persons convicted (not just accused) of subversive activities from holding public office.

- says that governmental writing must be in plain language.

- clarifies the time when voters must be asked if they want to have another constitutional convention.

- lets the next constitutional convention start a month earlier giving them 5 months before the general election instead of 4.

**34. TECHNICAL AND STYLE CHANGES.**

If adopted, this amendment:

- changes the Constitution where the subject may now be unconstitutional or unnecessary under the Constitution of the United States.

- changes style and language

- replaces words which sound like they apply to only men or women by words which apply to everyone.

- makes small changes which are related to the main purposes of the other amendments